1          UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2
      --------------------------------------------------------------
3                                    )
      United States of America,      ) File No. 20-cr-262
4                                    )            (ADM/ECW)
               Plaintiff,            )
5                                    )
      v.                             )
6                                    ) Courtroom 3C
      Fowzi Abdinasir Elmi,          ) St. Paul, Minnesota
7                                    ) Friday, June 11, 2021
               Defendant.            ) 11:14 a.m.
8                                    )
      --------------------------------------------------------------
9
            BEFORE THE HONORABLE ELIZABETH COWAN WRIGHT
10        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                       **MOTIONS HEARING**
11
      APPEARANCES
12     For the Plaintiff:         UNITED STATES ATTORNEY'S OFFICE
                                  BY:   JUSTIN A. WESLEY
13                                600 United States Courthouse
                                  300 South Fourth Street
14                                Minneapolis, Minnesota 55415

15
       For the Defendant:        LAW OFFICE OF JORDAN S. KUSHNER
16                                BY:   JORDAN S. KUSHNER
                                  431 South Seventh Street, #2446
17                                Minneapolis, Minnesota 55415

18
       Court Reporter:           RENEE A. ROGGE, RMR-CRR
19                                United States Courthouse
                                  300 South Fourth Street, #1005
20                                Minneapolis, Minnesota 55415

21        Proceedings recorded by mechanical stenography;
      Transcript produced by computer.
22

23                          *   *   *

24

25

1                          <u>I N D E X</u>

                                                            <u>PAGE</u>
2

   **KRISTOPHER DAUBLE**
3     Direct Examination by Mr. Wesley                       23
      Cross-Examination by Mr. Kushner                       50
4     Redirect Examination by Mr. Wesley                     65
      Recross-Examination by Mr. Kushner                     68
5

   **MIGUEL MARTINEZ**
6     Direct Examination by Mr. Wesley                       70
      Cross-Examination by Mr. Kushner                       90
7     Redirect Examination by Mr. Wesley                    113
      Recross-Examination by Mr. Kushner                    118
8

   **NATHAN SUNDBERG**
9     Direct Examination by Mr. Wesley                      123
      Cross-Examination by Mr. Kushner                      135
10    Redirect Examination by Mr. Wesley                    143
      Recross-Examination by Mr. Kushner                    146

11

12

   <u>EXHIBITS:</u>                                         <u>REC'D</u>
13    1                                                      34
      2                                                      34
14    3                                                      34
      4                                                      34
15    5                                                      34
      6                                                      34
16    7                                                      34
      8                                                      34
17    9                                                      34
      10                                                     34
18    11                                                     34
      12                                                     34
19    13                                                     34
      14                                                     34
20    15                                                     76
      16                                                     83
21    17                                                     34

22

23

24                          *   *   *

25

**P R O C E E D I N G S**

**IN OPEN COURT**

1

2

3          THE COURT:  Please be seated.  Thank you.

4          All right.  Good morning, everyone.  We are here

5   today for a motions hearing in the matter of United States

6   versus Elmi, Case No. 20-cr-262(ADM/ECW).

7          Let me cover COVID logistics before we take

8   appearances.  My current practice is that when lawyers are

9   speaking or arguing to the court or examining a witness they

10   may remove their masks, if they wish.  Witnesses when

11   testifying may remove their masks, if they wish.  However,

12   if anyone has concerns about this, you can let me know now.

13   You don't have to tell me why.  And we can get that sorted

14   out.

15          I'll take your appearance, Mr. Wesley, and you can

16   let me know if you have any concerns at the same time.

17          MR. WESLEY:  Justin Wesley for the government,

18   Your Honor, and we do not have any concerns about those

19   protocols.

20          THE COURT:  Okay.  Thank you.

21          And thank you, Mr. Kushner.

22          MR. KUSHNER:  Jordan Kushner representing

23   Mr. Elmi, who is seated to my right, and we're prepared to

24   live with the protocols.

25          THE COURT:  Okay.  And if you do have concerns,

```
1    let me know, though.  All right?  Okay.  Thank you.
2              MR. WESLEY:  Your Honor, I should note for
3    appearances that I have do case agent -- Special Agent Eli
4    Carpenter with the ATF here with me today.
5              THE COURT:  Okay.  All right.  Thank you.
6              So good morning to all of you.
7              We have a number of motions before the court
8    today, and I understand we also have a number of witnesses
9    who will be testifying.
10             Before I get to the motions in detail, let me
11   check with the government to see will -- will you still be
12   calling nine witnesses?
13             MR. WESLEY:  No, Your Honor.  I had emailed the
14   court indicating essentially I wouldn't put everyone through
15   that, unless I absolutely had to.
16             I've had the opportunity to speak with
17   Mr. Kushner.  For today's purposes, there are three separate
18   incidents, June 1st, 2019, January 2020 and then
19   September 15th, 2020.  I have three witness -- three
20   witnesses prepared to go forward on the January 2019 and
21   September 2020 incidents.
22             When trying to get people in from Oklahoma, the
23   Oklahoma witnesses, I found out they were either in
24   trainings or vacations.  I thought perhaps I could have them
25   sneak away and testify via Zoom, but upon speaking with
```

1    Mr. Kushner he does want the in-person appearance.  So,

2    unfortunately, I do have to respectfully request the court

3    to set another hearing where I can secure those witnesses.

4         The only other witness issue is there is an

5    Officer Joseph Grout, who took the statement of Mr. Elmi on

6    June 1st of 2019.  He's deployed on military orders.  I do

7    have his recorded interview, which I'm submitting to the

8    court as an exhibit.

9         In an ideal world I would like to have the officer

10   testify, especially given the challenge in District Court

11   Docket 62, which is a challenge to any and all statements

12   alleging that his client was either -- I think it was either

13   too tired or too impaired by drugs or alcohol, in order to

14   validate waiver of his rights.  So in an ideal world, if

15   Officer Grout is off of military orders, I would call him at

16   the next motions hearing as well, rather than just asking

17   the court to rely on the recorded interview.  Frankly, I

18   think the recorded interview is -- it's self-contained, it's

19   self-explanatory, it speaks for itself, but, again, in an

20   ideal world I would call Officer Grout.

21        Other than that, again, to try to streamline it so

22   we are not calling nine witnesses, I do have the disk for

23   the court.  I've provided an exact copy to Mr. Kushner

24   already.  It has 17 exhibits.  It essentially consists of

25   body-worn cameras, some photographs, a consent to search

1      forms and things of that nature.

2              Given the challenge to any and all statements,

3      I've spoken with Mr. Kushner asking if he could specify

4      which statements, outside of the formal statements, as those

5      are easy to identify, but there's lots of just interaction

6      with the defendant while the investigation is proceeding.

7      Mr. Kushner indicated that he was challenging all the

8      statements.  So what I've asked is that we introduce these

9      exhibits.  When Mr. Kushner is filing his paperwork, he can

10     specify the statements that he's challenging and I will

11     respond to those.  If Mr. Kushner finds that there are

12     statements that he wants to challenge that aren't on this

13     disk, which the government believes is comprehensive, then

14     he could add those later; and I would just stipulate to them

15     via email or make a filing, as long as it was part of the

16     regular discovery that was already provided.

17             So, Your Honor, with that long explanation, I

18     think that's how the government -- and I don't want to speak

19     for Mr. Kushner, but I think that's the plan for proceeding

20     today.

21             THE COURT:  Okay.  So let me, first of all, return

22     to the second hearing we'll be having and in particular

23     Officer Grout, who is on military service.  Do you -- it

24     wasn't clear to me if you anticipated that he would be

25     finished with his service anytime soon such that he would

1      appear at a hearing or if you and Mr. Kushner had discussed

2      whether he -- whether either one of you felt that Officer

3      Grout needed to testify at the second hearing.

4              MR. WESLEY:  I hadn't spoken with Mr. Kushner

5      about that particular issue.  With military orders, I would

6      like to say I know the date when he's coming back, but

7      sometimes they're extended.  I'm trying to indicate to the

8      court that my normal practice would be to call him so that

9      you would have some surrounding information about the

10     interview and what Officer Grout himself personally observed

11     and perceived.  If he's not able to be there, I will not be

12     asking for another continuance of the hearing because I do

13     believe that the recording speaks for itself.  It's not an

14     ideal scenario for the government, but that's the situation

15     that I'm in.

16             THE COURT:  Okay.  All right.  Thank you for that

17     clarification.

18             Let me turn then to Mr. Kushner.  Is there

19     anything you wanted to provide to the court or any concerns

20     you have about the government's proposal with regard to the

21     testimony today and then the subsequent hearing,

22     Mr. Kushner?

23             MR. KUSHNER:  I think it sums up what we

24     discussed.  I think there might be some confusion about the

25     dates.  I think my understanding is the dates of the stops

1    we're testifying about to are June 1st of 2019 and

2    September 15th of 2020.  I think Mr. Wesley might have

3    confused June and January at some point in his explanation,

4    but he's nodding his head, so I take it that's the

5    situation.

6              My position on the statements was that, you know,

7    if the -- we're challenging statements that the government

8    seeks to introduce at trial so that if they are -- if any of

9    these informal conversations are conversations that anyone

10   introduces as evidence, then we would be challenging them.

11             THE COURT:  All right.  So I think I understand

12   your position.

13             So here's what we will do with regard to, I guess,

14   the second hearing.  We will get a second hearing set, and

15   my courtroom deputy will communicate with counsel about

16   getting that scheduled.  And then, of course, we'll have to

17   work with the facility where Mr. Elmi is being held to make

18   sure we can do it all in compliance with COVID protocols.

19   So we'll get that on the calendar.

20             With regard to the statements, I understand the

21   government has 17 exhibits.

22             I should check.  Mr. Kushner, are you objecting to

23   the introduction of any of those exhibits?

24             MR. KUSHNER:  You know, I, I, I don't believe so.

25   I haven't had a chance to go through all of them.  So I

1    guess I'd like to -- I'd like to, you know, still reserve

2    the chance to be sure about that.  So I don't want to

3    like -- I'm not ready to just blanket stipulate to all

4    exhibits right now.

5              THE COURT:  Okay.  And, Mr. Wesley, were you

6    planning on introducing them in the course of the testimony

7    today?

8              MR. WESLEY:  The -- the government does not intend

9    on calling every single officer that took the actual

10   body-worn camera.  I did have sort of the overarching

11   investigator review the cameras that I intended on

12   submitting, and he was not at the scene, but he was the one

13   who had the tip on June 1st.  He reviewed the cameras.  He

14   knows all the people, knows the voices and knows that that

15   was the scene, and he knows the people that were in the car

16   from prior contacts.  So I think that he can lay sufficient

17   foundation, if I'm required to lay foundation.

18             The reason I'm submitting all 17 is because they

19   are the ones that I believe capture potential statements and

20   interactions with Mr. Elmi.  And because I don't have a

21   specific challenge to any particular statement, that's --

22   that's how I figured would be the best way to proceed in

23   this case, rather than to just say I'm not putting anything

24   on because you haven't specified the challenge.

25             THE COURT:  All right.  So here's what we will do.

1    To the extent you are introducing the exhibits, Mr. Wesley,

2    through the course of your examination of witnesses,

3    Mr. Kushner can make his objection at the time that they're

4    being introduced.

5             To the extent there are exhibits that you would

6    propose to introduce and have admitted that aren't coming up

7    in the course of the testimony, Mr. Kushner, if you intend

8    to object to those, you can do that in your post-hearing

9    submission.  Obviously, then the government will have a

10   chance to respond to that.

11            I sincerely hope we don't have to have a hearing

12   on the admissibility of a particular exhibit if it was

13   provided, but I want to have those 17 exhibits at least be

14   available to Mr. Kushner as they are, because I will expect

15   any challenges to a particular statement to be made with

16   sufficient particularity so that the court can rule on them.

17   In other words, the court is not going to review every

18   statement that was made by Mr. Elmi to see if it was

19   admissible or not if it's not been identified so that the

20   court knows to review it, because that's just not a

21   reasonable -- or I'm not even sure that's a possible task.

22            So I'll look for that in your post-hearing

23   filings, Mr. Kushner, and will set deadlines for that later.

24   Does that sound agreeable?

25            MR. KUSHNER:  Yes, I can work with that.

1              Now, let me just bring up another issue that it

2      looks like it's not going to come up at this testimony, but

3      just to anticipate and avoid complications in the future.

4      There was a custodial interrogation of Mr. Elmi in Oklahoma

5      on January 21st of 2020.  And I think -- I still don't have

6      any -- I have a video of that interrogation, but I don't

7      have any sound.  So I have not -- I've still not been able

8      to hear that interview.

9              MR. WESLEY:  It's -- not to have too many

10     conversations.  What happened was, as noted in the filings,

11     is that Mr. Kushner had a copy that he could open the video

12     and see it, but the audio didn't work.  I requested

13     originals to be mailed, rather than to be electronically

14     sent to me.  Weird things happen sometimes.  So I asked for

15     the originals, got the original software.  I confirmed that

16     it worked on my computer.  I sent him the new player, rather

17     than giving him an MP4 converted clip, which I thought might

18     be the problem.  And so I sent that via USAfx I believe

19     sometime in February.  And I've been -- sorry, Your Honor,

20     but I didn't confirm with Mr. Kushner.  I didn't hear back,

21     so I thought that solved the problem.

22             Mr. Kushner, I will definitely talk with you after

23     the hearing, but we do have that working copy with the

24     actual player that Oklahoma uses.  It's a proprietary

25     software and then causes a lot of problems sometimes.  But

1    we have it.  You are able to hear it.  I provided it to you

2    in February, I can't remember the date, but I will make sure

3    that you are able to play that.

4         THE COURT:  All right.  So I will let counsel work

5    out the details of how Mr. Kushner can hear as well as see

6    the custodial interview.  And since we're having another

7    hearing that sounds like it's going to be focused on the

8    Oklahoma piece of the case, we can address that, if needed,

9    down the road.

10        All right.  So I think that covers all of the

11   preliminaries.

12        I do want to be clear, as I've stated, that to the

13   extent there is a suppression motion with regard to any

14   statements, the statements will need to be identified in the

15   post-hearing briefing so that I know what I'm being asked to

16   make a recommendation on.

17        Let me turn to the motions that are now before the

18   court.  We have Docket 50, which is the government's

19   unopposed motion for discovery.  And then we have Dockets 51

20   to 58, which are a variety of motions filed on behalf of

21   Mr. Elmi that are what I call the non-suppression motions,

22   and then we have a couple of -- or several suppression

23   motions as well.  I have reviewed the parties' briefing with

24   regard to Dockets 51 through 58, which are the

25   non-suppression motions.

1        Let me -- let me see if counsel want to make any

2    additional argument on those motions.  And I'm going to

3    begin with you, Mr. Kushner, because I know the government's

4    response was the last brief.  Do you have any additional

5    arguments you wanted to make on those motions?

6        MR. KUSHNER:  I don't have any additional

7    arguments on the non-suppression motions.  I do think they

8    speak to themselves.  There might be some discussion about

9    timing issues with respect to early disclosure of *Jencks* and

10   expert witnesses that probably want to --

11       THE COURT:  Yeah.  So why don't we do this.  So

12   I'm just going to walk through the -- you can sit down, and

13   we'll go through it.  And if counsel want to remain seated

14   for this portion, that's fine, and that way you can be sure

15   you are talking into your microphones.

16       So the government's unopposed motion for

17   discovery, which is Docket 50, is granted.

18       The defendant's motion for release of *Brady*

19   materials, which is Docket No. 51, that is -- sorry.  I was

20   just getting tangled up in my notes here.  It wasn't really

21   an issue I was debating, for the record.  As to the

22   *Brady/Giglio* materials, that motion, Docket No. 51, is

23   denied in part as moot, based on the government's

24   representation that it's complied with its obligations under

25   *Brady*, *Giglio* and its progeny, but it is also granted in

1    part insofar as within ten days from today the government

2    must disclose all of its *Brady*/*Giglio* information in its

3    possession or of which it's become aware as of today's date

4    and must promptly supplement its disclosure upon the receipt

5    of any additional information.

6            Let me turn to the motion to compel disclosure of

7    404(b) evidence.  The government has proposed disclosure of

8    that evidence two weeks before trial begins.  The court

9    finds that that's an appropriate deadline.  So the motion is

10   granted in part insofar as the government shall disclose its

11   Rule 404(b) evidence two weeks before trial begins.  The

12   government is not required to disclose evidence that is

13   inextricably intertwined with a charged crime.  And then to

14   the extent the government becomes aware of additional 404(b)

15   evidence after it makes that disclosure, it should promptly

16   disclose that evidence.

17           With regard to the defendant's motion for

18   discovery, Docket 53, Mr. Kushner, I understood that motion

19   to be primarily seeking discovery under Rule 16.  Is there

20   any additional argument you wanted to make as to that

21   motion?

22           MR. KUSHNER:  At this point in time I'm not aware

23   of -- I'm not aware if there's -- if there's materials

24   covered by the discovery motion that are available that have

25   not been disclosed, other than informant information.  So I

1    guess if I find out -- I have some reason to believe at some

2    point that there's other items that are relevant that aren't

3    disclosed, I guess I would raise it, but I have nothing

4    further to raise now.

5              THE COURT:  Okay.  All right.  Thank you,

6    Mr. Kushner.

7              So the motion for discovery is granted in part and

8    denied in part.  I note that the government represents that

9    it's complied with its obligations under Rule 16 and will

10   continue to do so.  The motion is granted insofar as the

11   government is ordered to comply with its discovery

12   obligations under Rule 16.  To the extent the motion is

13   seeking material outside of the scope of Rule 16, it is

14   denied.

15             Let me turn to Docket 54, which is the motion for

16   discovery of expert.  You know, I know that the government

17   proposed 16 days or -- excuse me -- 14 days before trial in

18   its brief.  But my concern with that timing is it doesn't

19   leave any really time for rebuttal or very little time for

20   rebuttal.  So my standard is typically a disclosure of

21   expert evidence 30 days before trial with rebuttals due 10

22   days before trial.

23             Do either counsel have a concern with that timing?

24   Mr. Wesley?

25             MR. WESLEY:  No, Your Honor.

1          THE COURT:  Okay.  Mr. Kushner?

2          MR. KUSHNER:  No.

3          THE COURT:  Okay.  So initial expert disclosures

4     will be due 30 days before trial, and then any rebuttals

5     will be due 10 days before trial.  So that motion is granted

6     insofar as I have set those deadlines for expert witness

7     disclosures.

8          Okay.  Let me turn to the motion for disclosure

9     for grand jury transcripts, which is Docket 55.  To the

10    extent it is seeking transcripts of any witness who would

11    testify today or at the anticipated hearing, I understand

12    the government doesn't intend to offer any witnesses who

13    testified.  Do I have that right?

14         MR. WESLEY:  That is correct, Your Honor.

15         THE COURT:  Okay.  So in view of that, the motion

16    is denied as moot.

17         Now, with regard to the transcripts and statements

18    as to witnesses who may testify at trial, I understand the

19    government has represented that it will voluntarily provide

20    any Jencks Act material no later than three business days

21    before trial.

22         Does that address your request with this motion,

23    Mr. Kushner, or are you seeking anything beyond that?

24         MR. KUSHNER:  Was it three days before trial?

25         THE COURT:  Three business days before trial.

1          MR. KUSHNER:  Yeah, I mean, that, you know, three

2     days -- you know, it comes up every time.  It's -- sometimes

3     the government generously volunteers to provide it more in

4     advance, but, you know, it doesn't really provide for

5     adequate preparation for trial.  And I -- three days before

6     trial I'm doing all kinds of things to get ready; and then

7     if I get a pile of additional documentation, then it's

8     really hard to prepare and so I -- and, you know, ultimately

9     it might end delaying the proceedings or make them more

10    inefficient.  So I would urge a longer period of time, like

11    two weeks.

12          THE COURT:  Right.  The problem, of course, and

13    this comes up with regard to the Jencks Act motion, is that

14    according to the Eighth Circuit I don't have the authority

15    to order that.  So based on the binding Eighth Circuit

16    precedent, I'm not going to order the government to provide

17    its Jencks Act material more than three days before trial,

18    or really at any time, because I'm just not permitted to do

19    so under the law.  But I will certainly accept the

20    government's representation that it will do it no later than

21    three business days before trial and encourage the

22    government to do it earlier, if possible, to avoid these

23    inefficiencies and so on.  Okay.

24          MR. WESLEY:  Your Honor, just so the court knows,

25    my personal habit is to disclose as much information as

1    possible, notwithstanding whether it's Jencks or not, and

2    the only reason that I personally hold back the Jencks

3    material is if there is a legitimate government interest in

4    doing so.  And I appreciate the Jencks Act.  I don't -- I

5    hope it does not change because there are many cases where

6    there's personal safety at risk and there's other valid

7    government reasons for withholding it until testimony.

8    However, I mean, it's not like I'm going to throw hundreds

9    of pages of discovery to Mr. Kushner three days before

10   trial.  He has -- he has the vast majority of the Rule 16

11   material and a lot of the Jencks material as well, just not

12   all of it at this point.

13            THE COURT:  Okay.  All right.  Thank you,

14   Mr. Wesley.

15            Mr. Kushner, is there anything else you wanted to

16   say about the grand jury transcripts?

17            MR. KUSHNER:  No.

18            THE COURT:  Okay.  All right.  So let me turn to

19   Docket No. 56, which is the motion to compel disclosure of

20   informant.  The motion that was filed was fairly short.

21            So, Mr. Kushner, do you have any additional

22   argument that you wanted to make on this motion now that we

23   have the government's brief and position as to the

24   informants?

25            MR. KUSHNER:  Well, the only informant I'm aware

1    of is the one who provided information that led to the

2    June 1st, 2019, stop.  And so I believe that's, you know,

3    relevant.  That could be *Brady* material and could go to the

4    issues about whether there was probable cause for the stop.

5    So I believe that the informant's identity and the

6    statements -- the information about the informant and the

7    statements that he or she made should be disclosed.

8              THE COURT:  Okay.  Mr. Wesley, do you want to make

9    any additional argument as to this motion right now?

10             MR. WESLEY:  I just stand on the -- this

11   confidential reliable informant was not a material witness

12   to the offense.  And today I expect the court to hear from

13   the officer who received the tip just that this particular

14   individual was reliable, what the information provided was

15   and that they relayed that information to another -- to

16   other officers.  So, therefore, we stand on the government's

17   position that this person is not a material witness to the

18   offense and should not be disclosed under the informant's

19   privilege.

20             THE COURT:  All right.  Here's what we'll do for

21   Docket No. 56.  I'm going to take it under advisement.

22   Obviously, there's going to be some testimony on this as to

23   this motion.

24             And then, Mr. Kushner, to the extent you want to

25   make additional argument, you can do it in your post-hearing

1    briefs.  And then the government can respond to it after the

2    testimony comes in.

3              So Docket 56 will be taken under advisement.

4              The motion to require government agents to retain

5    rough notes, Docket 57, is granted to the extent that the

6    government has already represented that it does not object

7    to requiring law enforcement to retain and preserve their

8    notes.  And I guess if the government has not already done

9    so, it is ordered to instruct the law enforcement officers

10   involved to retain and preserve their rough notes.

11             And then, finally, we come to the motion for early

12   disclosure of Jencks Act material, which is Docket 58.  As

13   I've already previewed, that motion will be denied because

14   the court lacks the authority to order the production of

15   Jencks Act material.  However, the government has

16   represented that it will provide any such material

17   voluntarily no later than three business days before trial.

18             I think that covers the non-suppression motions.

19   Is there anything I've missed, Mr. Wesley, from the

20   government's perspective?

21             MR. WESLEY:  I do not believe so, Your Honor.

22             THE COURT:  Okay.  Mr. Kushner, anything for the

23   non-suppression motions that you wanted to raise?

24             MR. KUSHNER:  Not that I can see.

25             THE COURT:  All right.  Well, then we can proceed

1    with the witness testimony then.  Mr. Wesley, would you like

2    to call your first witness?

3                MR. WESLEY:  Yes, Your Honor, but, if I may, so I

4    don't forget, may I present the flash disk that has the

5    encrypted password on it that contains the 17 exhibits we

6    discussed earlier?

7                THE COURT:  Okay.  Thank you.  If you would like

8    to give it to my law clerk, we'll -- all right.

9                The first time I got one of those, I had to go on

10   YouTube and figure out how to get the flash drive out of the

11   card.

12               MR. WESLEY:  I try to be as helpful as I can in

13   making sure that everyone is able to access it.  I probably

14   shouldn't, but I put a Post-it on it when I handed it to the

15   clerk.

16               But in any event, Your Honor, the government does

17   call Officer Kristopher Dauble from the Minneapolis Police

18   Department as its first witness.

19               THE COURT:  Okay.  And while the agent is getting

20   Officer Dauble, I will just confirm, Mr. Kushner, you've

21   received a copy of those exhibits, correct?

22               MR. KUSHNER:  Yes, I have.

23               THE COURT:  Okay.  Great.  Thank you.

24               And then, Mr. Wesley, I think you are going to

25   introduce them as we walk through, to the extent you can,

 1    right?

 2              MR. WESLEY:  I will do that.

 3              THE COURT:  Or offer them, I should say.  Okay.

 4         And, Officer Dauble, if you want to come on up

 5    here.  Our witness stand is over there, as you can see.  And

 6    then we'll get you sworn in.  My practice is that if a

 7    witness such as yourself wants to remove his mask while

 8    testifying, you are certainly welcome to do so.  If you

 9    have -- if you don't want to remove it, you can say so; and

10    then I'll see if anyone has any objection to it, and we will

11    deal with it then.

12              THE WITNESS:  Okay.  Thank you.

13              THE COURT:  Okay.  If you could raise your right

14    hand, please.

15                        KRISTOPHER DAUBLE,

16    called on behalf of the government, was duly sworn, was

17    examined and testified as follows:

18              THE WITNESS:  Yes.

19              THE COURT:  All right.  You may sit down, and then

20    we'll get your name and proceed with the examination.

21         And, Officer Dauble, if you are going to -- are

22    you going to put your mask on or not?  You don't have to.  I

23    just want to know because I --

24              THE WITNESS:  No.

25              THE COURT:  You are not going to.  Okay.  That's

DAUBLE DIRECT (WESLEY)

1    great.  Then I don't need to check for objections, so --

2              All right.  If you wanted to proceed, Mr. Wesley.

3              MR. WESLEY:  Yes, Your Honor.  I was just going to

4    ask, Do you want me at the lectern or seated?

5              THE COURT:  The lectern is fine, if you would

6    prefer that.

7              MR. WESLEY:  May I stay seated?

8              THE COURT:  You may stay seated, yes.  Okay.

9                        DIRECT EXAMINATION

10   BY MR. WESLEY:

11   Q.  Officer Dauble, could you please state your full name

12   for the record?

13   A.  Yeah.  My name is Kristopher Dauble.  It's

14   K-R-I-S-T-O-P-H-E-R.  And the last name is D-A-U-B-L-E.

15             MR. WESLEY:  I'm sorry, Your Honor.  You did just

16   swear him in, right?

17             THE COURT:  I did.

18             MR. WESLEY:  Thank you.

19   BY MR. WESLEY:

20   Q.  So, Officer Dauble, you work for the Minneapolis Police

21   Department; is that right?

22   A.  Correct.

23   Q.  How long have you worked for the Minneapolis Police

24   Department?

25   A.  Since 2015.

1    Q.  What is your current assignment?

2    A.  I'm currently assigned to the gun investigations unit.

3    Q.  And back in June of 2019, what unit were you in?

4    A.  I was in the gang interdiction team.

5    Q.  And at this point in time has the gang unit essentially

6    been dissolved and many of those same persons now work in

7    the weapons unit that you are currently in?

8    A.  Yes, sir.

9    Q.  How long were you in the gang unit back in 2019?

10   A.  I began sometime in 2018.

11   Q.  And are the primary duties of officers in the gang unit

12   to investigate, try to be proactive about the investigation

13   into crimes committed by gang members?

14   A.  Yes.

15   Q.  And essentially is that a lot of shootings and drug

16   crimes and other violent offenses?

17   A.  Correct.

18   Q.  Before we get into other things about this case, is it

19   true that the gang unit is a limited number of officers and

20   you guys typically work very closely together; is that

21   right?

22   A.  Yeah, I think it was approximately 10 or 12 of us.

23   Q.  I just want to talk to you about some foundational

24   issues regarding some of the exhibits that the government is

25   offering here today.

1    In preparation for your testimony, yesterday do

2    you recall me showing you 17 exhibits regarding the

3    incidents on June 1st, 2019, and September 15th of 2020?

4    A.  I do.

5    Q.  And with regard to the June 1st ones, there were 14

6    exhibits there; is that right?

7    A.  Yes.

8    Q.  And while you may not specifically recall the file names

9    of them, do you recall reviewing two videos, which are

10   marked and offered to the court as Exhibits 1 and 2,

11   belonging to Officer Nathan Sundberg?

12   A.  Yes.

13   Q.  And you've worked with Officer Sundberg for sometime?

14   You recognize his voice; is that correct?

15   A.  Correct.

16   Q.  And just while you weren't at the scene of this

17   incident, from viewing it could you tell that it was the

18   incident described in the police reports?

19   A.  Yes, I could.

20   Q.  And could you -- could you recognize at least some of

21   the five individuals that were in the car at the time?

22   A.  Yes, I did.

23   Q.  And we'll get into more detail later, but did you have

24   prior familiarity with the defendant Fowzi Elmi?

25   A.  Yes.

1    Q.  And did you have prior interactions and knowledge of his

2    brother Fahad Elmi?

3    A.  I did.

4    Q.  And did you know Ish?  Is it Abdulkadir, one of the

5    passengers?  I forget his last name.

6    A.  Yes, I did.

7    Q.  You had familiarity with him?

8    A.  Yes.

9    Q.  And then the other two passengers, did you have

10   familiarity with them as well?

11   A.  With the driver.  Not so much the back passenger.  I

12   think Eden [phonetic] or Adan was the name of him.

13   Q.  So four of the five individuals you had known and could

14   recognize from the body cameras?

15   A.  Yes.

16   Q.  So moving on to Exhibits 3 through 5, did you review

17   body-worn camera from the incidents belonging to Officer

18   Russell Cragin?

19   A.  Yes, I did.

20   Q.  And, again, you recognized his voice, and from being

21   captured on other body cameras you know he was at the scene

22   as well?

23   A.  Yes.

24   Q.  Exhibit 6.  Did you recognize the body-worn camera of

25   Sergeant George Peltz?

1   A.  Yes, I did.

2   Q.  Exhibit 7.  Did you recognize the body-worn camera of

3   Officer Thomas Conlin from this incident?

4   A.  Yes.

5   Q.  Exhibits 8 and 9.  Did you recognize those as body-worn

6   cameras from this scene of Officer Joseph Grout?

7   A.  Yes.

8   Q.  Exhibit 10.  Did you recognize this as the body-worn

9   camera of the interview of Mr. Elmi conducted by Officer

10  Grout?

11  A.  Yes.

12  Q.  From Exhibit Nos. 11 and 12, did you recognize those as

13  the body-worn cameras as Officer William Martin?

14  A.  Yes.

15  Q.  And did you -- were you aware that as part of this

16  investigation -- it's been marked as Exhibit 13 -- that

17  there was a consents to search form filled out by Officer

18  Grout to obtain DNA from Mr. Elmi; is that right?

19  A.  Yes, there was.

20  Q.  And do you recognize mister -- or Officer Grout's

21  signature or the officer's signature on that form?

22  A.  Yes.

23  Q.  And there was also a photo taken.  Did you recognize

24  that as a body-worn camera photo taken of the gun in the

25  trunk on June 1st of 2019?

```
 1    A.  Yes.
 2    Q.  I'm going to skip 15 because actually I don't think you
 3    reviewed that one -- that's Officer Miguel Martinez from the
 4    September date -- and also 16 because that's a photo from
 5    that incident.
 6              But with regard to Exhibit No. 17, the interview
 7    of Mr. Elmi on September 15th of 2020, was that you who in
 8    fact conducted that interview?
 9    A.  Yes, it was.
10    Q.  And was that a fair and accurate copy of the recording
11    that you made of your interview with Mr. Elmi?
12    A.  Yes.
13              MR. WESLEY:  With that, Your Honor, I would offer
14    Exhibits 1 through 14 and then Exhibit No. 17 through this
15    witness.
16              THE COURT:  Any objections?
17              MR. KUSHNER:  I don't have any objection to
18    Exhibit 17.  Could I voir dire the witness as to the other
19    exhibits?
20              THE COURT:  1 through 14?
21              MR. KUSHNER:  Yeah.  I'm not sure what the noise
22    is.  Did I do something here?
23              THE COURT:  Mr. Wesley, how many of these exhibits
24    are you planning on using in the course of your testimony?
25              MR. WESLEY:  Officers -- actually, I plan on
```

1    producing none right now.  For the court's review,

2    Exhibits 1 and 2 are actually of Officer Sundberg's, and

3    those will be important.  There is sort of a camera angle

4    issue with the drugs that were found in the backseat, and so

5    that does involve other of these body-worn cameras.

6    Frankly, they are all just different angles of the traffic

7    stop at the scene.  So I could also call Officer Sundberg

8    and have him testify that this is fairly captured at the

9    scene.

10            And I apologize, Your Honor.  I thought these were

11    just going to be introduced.

12            And, again, I'm not going to call every single

13    person, but I can have especially Officer Sundberg who was

14    at the scene review all of these and say this is from the

15    scene, but I think Officer Dauble has already done that as

16    well.  Plus, we're at a motions hearing where the Rules of

17    Evidence are obviously relaxed.  I can represent to the

18    court as well that these are all the body cameras from this

19    incident.  Officer Dauble has testified that they are.  And,

20    frankly, I'm not sure how there can be an objection to

21    foundation at this point.

22            THE COURT:  Yeah, Mr. Kushner, can you explain to

23    me why you think you need to voir dire the witness on these

24    exhibits?

25            MR. KUSHNER:  To determine if there's adequate

1    foundation.  I understand that the rules -- evidentiary

2    rules are relaxed, but there are still standards the

3    evidence has to be reliable, so -- it doesn't have to meet

4    the standards that would a trial, but I don't think it would

5    be accurate to say that there's no standards.  So I'm just

6    trying to make a record as to, you know, the degree of that

7    knowledge that this witness has about those exhibits.

8              THE COURT:  Do you think you're -- have you

9    reviewed Exhibits 1 through 14?

10             MR. KUSHNER:  Yeah, I can't promise that I

11   reviewed every single one of them.  I probably have.  I

12   certainly looked at -- certainly looked at most of them.

13             THE COURT:  All right.  Are you able to perform a

14   brief voir dire as to Exhibits 1 through 14 collectively in

15   view of the representations of what --

16             MR. KUSHNER:  I wasn't planning to grill him about

17   every detail of every single exhibit.

18             THE COURT:  Okay.  Why don't you begin your voir

19   dire, and we'll see if -- we'll see what comes of it.

20             MR. KUSHNER:  So, Officer Dauble, so I believe

21   that exhibits -- Exhibits 1 through 9 -- and then what is

22   it?  I believe 1 through 9 and 11 through 12 are body

23   cameras related to the vehicle stop and then subsequent to

24   search and detention on June 1st of 2019.

25             THE WITNESS:  I would suppose so.  I don't have --

```
1     not specific information on the numbers, on the evidence

2     numbers, so --

3                   MR. KUSHNER:  Okay.  All right.

4                   MR. WESLEY:  I'll stipulate to that, Your Honor.

5                   THE COURT:  Okay.

6                   MR. KUSHNER:  And were you -- did you participate

7     in any of that, those events?

8                   THE WITNESS:  I did not, no, not in person.

9                   MR. KUSHNER:  So your -- so your -- so your

10    knowledge from the viewing of video would be based on your

11    investigation, but it wasn't any personal observation on

12    your part of any of those incidents?

13                  THE WITNESS:  Not that day, no.

14                  COURT REPORTER:  I cannot hear you, Mr. Kushner.

15                  THE COURT:  Yeah, Mr. Kushner, if you want to just

16    remain seated.  I know it feels awkward because we don't

17    normally do it, but that way you can talk into the mic.

18                  MR. KUSHNER:  And did you -- did you have any role

19    in the consent to search form that was purported to be

20    signed by Mr. Elmi?

21                  THE WITNESS:  No.

22                  MR. KUSHNER:  That will be Exhibit 13.

23                  Okay.  All right.  I don't have anything further.

24                  You know, my -- our position would be that there

25    isn't adequate foundation for all the -- for all the body
```

1    cam videos or the consent to search form.

2            And then also -- I'm sorry.  One more question.

3    You didn't participate in the interview of Mr. Elmi on

4    June 1st of 2019?

5            THE WITNESS:  That's correct.

6            MR. KUSHNER:  So you didn't observe him -- or did

7    you observe him at all on that date?

8            THE WITNESS:  No.  I wasn't physically present.

9            MR. KUSHNER:  Okay.  All right.  So I would submit

10   for Exhibits 1 through 14 that there isn't adequate

11   foundation.

12           THE COURT:  All right.  Mr. Wesley, is there any

13   additional testimony you'd like to elicit as to these

14   exhibits?

15           MR. WESLEY:  Just a little bit more to clarify to

16   the court.

17           THE COURT:  Certainly.

18   BY MR. WESLEY:

19   Q.  Mr. Dauble, you weren't at the scene, but you obtained

20   the tip that resulted in the stop of the vehicle; is that

21   right?

22   A.  Correct.  And I was speaking with the officers on the

23   scene prior to, during and after via phone.

24   Q.  All right.  So you were basically getting realtime

25   information, although you didn't happen to be working at the

ERODA MEDAMA-ELANT (WESLEY)

```
 1    scene at that time?

 2    A.  Correct.

 3    Q.  Were you on or off duty at the time, actually?

 4    A.  I believe I was off duty.

 5    Q.  So you were essentially -- you got the tip because it

 6    was your informant, but then you were relaying all the

 7    information to officers because it was a time-sensitive

 8    thing; is that right?

 9    A.  That's correct.

10    Q.  You got realtime updates while it was all going down; is

11    that right?

12    A.  Yes.

13    Q.  And then because essentially Mr. Elmi -- you're the main

14    officer responsible for his investigation at the Minneapolis

15    Police Department; is that right?

16    A.  I am.

17    Q.  You did end up going in and reviewing all these videos

18    shortly after the incident, and then you also reviewed them

19    again yesterday; is that right?

20    A.  I reviewed them several times.

21    Q.  And you know from working with these people, from

22    knowing Mr. Elmi, that these are all accurate recordings

23    from that date?

24    A.  Yes.

25              MR. WESLEY:  Nothing further, Your Honor.
```

CROSS-EXAMINATION - WESLEY

```
 1              THE COURT:  Exhibits 1 through 14 and 17 are

 2    admitted for purposes of this motions hearing and the

 3    pending motions.

 4    BY MR. WESLEY:

 5    Q.  So jumping back, Officer Dauble, to your experience in

 6    the gang unit, essentially you investigated and tried to do

 7    the proactive investigations with various different gangs in

 8    the City of Minneapolis and who also operated out -- outside

 9    of the City of Minneapolis as well; is that right?

10              MR. KUSHNER:  Objection.  Leading.

11              THE COURT:  Sustained.

12    BY MR. WESLEY:

13    Q.  What types of gangs were you involved in investigating

14    back when you were in the gang unit in 2019?

15    A.  The vast majority of my time was spent on Somalia or

16    East African gangs.

17    Q.  And could you describe for the court what the major

18    gangs were from Somalia or East African gangs at the time?

19    A.  There were several numerous cliques, but the main

20    umbrella gangs, what I call them, I guess, was 1627 Boys and

21    the Somalia Outlaws.

22    Q.  Could you tell the court where the 1627 Boys were

23    essentially based, geographically-wise?

24    A.  It would be downtown Minneapolis and the Cedar-Riverside

25    area.
```

1    Q.  And the Somalia Outlaws, did they have a location or
2    were they just all over the place?
3    A.  They were mostly in what we call the Fifth Precinct.  So
4    like Karmel Mall, along West Lake Street and like Pillsbury.
5    Q.  And which one of these two gangs was established first?
6    A.  I believe it was the Somalia Outlaws.
7    Q.  And how would you describe the ages of the members of
8    the Somalia Outlaws compared to the ages of the 1627 Boys?
9    A.  They are much older and much more organized.
10   Q.  Could you describe for the court -- well, let me first
11   ask you.  Were you also involved in investigations and
12   police work regarding non-Somalia and East African gangs as
13   well?
14   A.  Yes, I was.
15   Q.  So are you familiar with gangs like Young 'N Thuggin',
16   YNT, the so-called high-end white gangs?
17              MR. KUSHNER:  Objection.  Leading.
18              MR. WESLEY:  Your Honor, I'm just looking for
19   preliminary information.
20              THE COURT:  It's overruled.
21              THE WITNESS:  Yes, I've done multiple gang
22   investigations.
23   BY MR. WESLEY:
24   Q.  Could you describe for the court any primary differences
25   between the Somalia Outlaws and 1627 Boys compared to the

1    other gangs in Minneapolis?

2    A.   At one point I believe both those gangs were considered

3    the most violent in the city, based on their high-level

4    propensity of violence and how quickly --

5           MR. KUSHNER:  Objection.  Lack of foundation and

6    irrelevant.

7           THE COURT:  The objection is overruled.

8           THE WITNESS:  -- and how quickly the two gangs

9    will retaliate for gang feuds.

10   BY MR. WESLEY:

11   Q.   And particularly back in 2019, was there any other

12   concerns besides shooting and homicides being committed by

13   the Somalia Outlaws and 1627 Boys, criminal activity-wise?

14   A.   Yes.  They were committing countless burglaries,

15   robberies and sales of narcotics.

16   Q.   With regards to the sales of narcotics, was there any

17   particular drug that both of those gangs were predominantly

18   involved in?

19   A.   I'm familiar that both of them predominantly sold MBox,

20   what we call -- they call on the street, or Percs, fentanyl

21   pills.

22   Q.   All right.  And so just so the court has a good idea of

23   what these are, you referred to them as three different

24   names, but are they all referring to the same drug?

25   A.   Yes.

1    Q.  What does that drug look like?

2    A.  It's a very small, like almost sky blue, tablet with a

3    capital M on one side that's encased in a square and a 30 on

4    the opposite side pressed in.

5    Q.  And is that pill meant to look like an actual drug?

6    A.  Yes.  They're pressed to be similar to commercially-made

7    Oxycodone pills or Percocets.

8    Q.  But based on your training, experience and all of the

9    pills that you've seized off the street, have they been

10   legitimate prescription pills or have they contained

11   something else?

12   A.  All of the ones I've recovered have contained fentanyl.

13   Q.  Could you tell the court roughly when, maybe even the

14   year, that you first encountered Mr. Fowzi Elmi, the

15   defendant?

16   A.  I couldn't give you a specific date, but I was working

17   in the First Precinct, which is downtown, between 2016-2018,

18   which I had numerous encounters with him during that time.

19   Q.  And to be fair, these weren't all criminal

20   investigation-type interactions?

21   A.  Correct.

22   Q.  But you had the opportunity to speak with Mr. Fowzi Elmi

23   on numerous occasions; is that right?

24   A.  Countless numbers.

25   Q.  And did you also have the opportunity to speak with his

CROSS-EXAMINATION - (WESLEY)

1     older brother Fahad Elmi?

2     A.  Yes.

3     Q.  So you are familiar with both of these brothers?

4     A.  Yes, I am.

5     Q.  As you moved to the gang unit and started having more

6     investigative work with drug crimes and violent crimes, did

7     Mr. Fowzi Elmi continue -- his name continue to come up in

8     your investigations?

9     A.  Yes, it did.

10    Q.  Could you tell the court just in general why his name

11    was on the radar?

12    A.  I was always receiving either tips or receive -- I'm

13    sorry -- reading police reports where his name was involved

14    in narcotics and activity.

15    Q.  Prior to the June 1st traffic stop, did you also receive

16    similar information about his brother Fahad Elmi?

17    A.  Yes, I have.

18    Q.  And based on your training and experience and your

19    knowledge and focus on these two gangs, the Somalia Outlaws

20    and 1627 Boys, do you have an opinion as to whether the Elmi

21    brothers were a member or an associate of either one of

22    those groups?

23              MR. KUSHNER:  Objection.  Lack of foundation.

24              THE COURT:  Mr. Wesley.

25

1    BY MR. WESLEY:

2    Q.  So, Officer Dauble, how long were you in the gang unit,

3    starting with the beginning date and then to the end date of

4    its dissolution?

5    A.  I believe it was end of summer 2018 until this past

6    summer of 2020 -- 2020.  I'm sorry.

7    Q.  And even though you are in the weapons unit now, do you

8    continue to investigate the same types of crimes and

9    individuals that you did when you were in the gang unit?

10   A.  It's essentially the same unit, just a different name.

11   So we do the same thing.

12   Q.  Are you familiar with the State of Minnesota's checklist

13   and the number points where they determine whether or not

14   the entity actually constitutes a gang?

15   A.  Yes, I am.

16   Q.  And in the past have you testified in cases as a gang

17   expert to determine whether or not a person belongs to a

18   gang or not?

19   A.  Yes, I have.

20   Q.  And in fact have you testified in cases specifically

21   involving Somalia gangs?

22   A.  Yes.

23   Q.  And so, based on your training and experience, do you

24   have an opinion as to whether the Elmi brothers, both the

25   defendant and Fahad Elmi, were members or associates of

1    either the Somalia Outlaws or the 1627 Boys?

2    A.  Yes, I believe they are members of the 16 --

3              MR. KUSHNER:  Objection.  Lack of foundation.  He

4    still hasn't established foundation as to being able to

5    testify specifically as to Mr. Elmi's involvement in a gang.

6    And there's also been this issue raised about this so-called

7    checklist, which I think is highly -- which is highly

8    suspect and certainly not any kind of scientific -- anything

9    that's determined to be scientifically reliable and is

10   subject, you know, to racial bias objections in the past.

11   And so to make this kind of general testimony about

12   Mr. Elmi's associations, based on the testimony that's been

13   presented so far, is not supported.

14             THE COURT:  The court finds that the witness has

15   adequately laid foundation both as to knowledge of certain

16   of Mr. Elmi's activities and basis for knowledge with regard

17   to certain gang activity, the criteria for gang activity and

18   the specific gangs at issue.

19             Mr. Kushner, you can certainly make your arguments

20   regarding your concerns, which I have heard, in your

21   briefing, but the objection is overruled.

22             And you may answer.

23             THE WITNESS:  Yes, I believe Mr. Elmi is a member

24   of the 1627 Boys.

25

1    BY MR. WESLEY:

2    Q.  And did that include also his brother Mr. Fahad Elmi?

3    A.  Yes.

4    Q.  So you had all this information prior to the June 1st,

5    2019, traffic stop?

6    A.  Yes.

7    Q.  Now, moving to that traffic stop, on that day you were

8    not working at the scene, but you had received a call from a

9    confidential reliable informant; is that right?

10   A.  Correct.

11   Q.  And could you just briefly describe for the court in

12   general how important confidential reliable informants are

13   and were in your work in investigating gang crimes?

14   A.  I would basically say that without having reliable

15   confidential informants that we weren't able to do our job

16   as well as we are.

17   Q.  And is it -- is it true or not true that you have

18   different kind of levels of people that are providing

19   information?

20              MR. KUSHNER:  Objection.  Leading.

21              THE COURT:  Overruled.

22              THE WITNESS:  Yes, there is.

23   BY MR. WESLEY:

24   Q.  So if a person comes to you, you don't know them and you

25   have no idea who they are and they provide you with

1    information, do you give more or less scrutiny to -- on the

2    information they are being -- they are providing to you?

3    A.  A lot more scrutiny.

4    Q.  When you say "confidential reliable informant," can you

5    tell the court what you mean by that?

6    A.  For the way I describe that is an informant who has

7    worked with me in the past who has been found to be

8    reliable, timely, accurate, and has provided information to

9    me that has resulted in arrests and collection of evidence,

10   narcotics, weapons.

11   Q.  In this particular case, the CRI that gave you the tip,

12   had you been working with that person for some time?

13   A.  I'd say roughly six to eight months.

14   Q.  And had this person provided you with tips in the past

15   that you were independently able to verify that information?

16   A.  Yes.

17   Q.  Did it result in the recovery of firearms?

18   A.  Yes.

19   Q.  Did their information result in the recovery of drugs?

20           MR. KUSHNER:  Objection.  Leading.

21           THE COURT:  Overruled.

22           THE WITNESS:  Yes, it did.

23   BY MR. WESLEY:

24   Q.  Did it result in the arrests of individuals and

25   successful prosecutions?

1    A.  Yes.

2    Q.  Could you please tell the court on June 1st of 2019

3    generally what the information this particular CRI provided

4    to you regarding Fahad Elmi, to be clear, not the defendant,

5    but the brother?

6    A.  The informant provided me with a vehicle description and

7    plate number of a vehicle and a general area of where this

8    vehicle was located and said that Mr. Elmi here, Fahad Elmi,

9    was dealing narcotics, specifically MBox pills.

10   Q.  And did the informant also provide you with any

11   information about a weapon?

12   A.  He said he believed they were in possession of a gun.

13   Q.  And where was that gun to be found by officers,

14   according to the CRI?

15   A.  Inside the rear of the vehicle.  In the trunk area.  I'm

16   sorry.

17   Q.  So did you relay the specific car description, you know,

18   make, model, color?  Is that the information you received?

19   A.  Yes, and the plate number.

20   Q.  And you relayed that to your fellow officers who were

21   working in the gang unit; is that right?

22   A.  Yes, I did.

23   Q.  Did you tell your fellow officers where the car may be

24   found, based on what the CRI said?

25   A.  Yes.

1    Q.  And did you also relay the information that Fahad Elmi

2    was dealing these MBox fentanyl pills out of the car?

3    A.  Yes, I did.

4    Q.  And did you also relay the information that there was a

5    firearm said to be in the car?

6    A.  Yes.

7    Q.  And you mentioned earlier you were getting realtime

8    updates.  Were you made aware that the officers found the

9    car in the general area of where the CRI said it would be?

10   A.  Yes, they did.

11   Q.  And without getting into too many specifics, was it

12   relayed back to you that they ended up finding pills,

13   finding a gun after the traffic stop?

14   A.  Yes.

15   Q.  And while you weren't there, you ended up, you know,

16   counting the pills after the initial stop was concluded; is

17   that right?

18   A.  Yes, I did.

19   Q.  And then you sent those for testing.  So you had other

20   involvement in the case afterward, right?

21   A.  Yeah.  After the fact, yes.

22   Q.  But essentially you didn't do the interviews that were

23   on the scene during the June 1st stop?

24   A.  Correct.

25   Q.  Did you continue your investigation into the Somalia

CROSS-EXAMINATION - EGW (WESBY)

1    gangs, the East African gangs and the distribution of these

2    fentanyl pills?

3    A.  Yes, I did.

4    Q.  Jumping ahead for purposes of this motion hearing to

5    September 15th of 2020, again, this was an incident where

6    you were initially not at the scene, right?

7    A.  Correct.

8    Q.  But when you came into work later in the morning, you

9    were made aware of an incident involving Mr. Elmi and the

10   Minneapolis Police Department around 3 a.m. on

11   September 15th, 2020; is that right?

12   A.  Yes.

13   Q.  And you ended up interviewing Mr. Elmi about that

14   incident about nine hours later, about shortly after noon;

15   is that right?

16   A.  Approximate time, yes.

17   Q.  And you interviewed him?

18   A.  You said did I?

19   Q.  Yes.  Did you interview the defendant Mr. Elmi?

20   A.  Yes, I did.

21   Q.  Did you read him his Miranda rights?

22   A.  Yes.

23   Q.  Did you record not only the reading, the waiver, but the

24   entire interview?

25   A.  I did.

```
1    Q.  Was it audio-recorded?

2    A.  Yes.

3    Q.  And that's Exhibit No. 17 that you reviewed?

4    A.  Yes.

5    Q.  During this conversation, after reading him his Miranda

6    rights, did he agree to speak with you?

7    A.  He did.

8    Q.  For the court, how would you describe the ability to,

9    you know, hear Mr. Elmi's voice on the recording?

10   A.  I would say it was fairly easy to hear.

11   Q.  How would you describe the way Mr. Elmi speaks when you

12   are in person and you've had all these conversations with

13   him in the past?  How would you describe the way he talks?

14   A.  I'd say he's kind of -- talks a little slower, maybe not

15   as higher volume as other people do.

16   Q.  He's a little quieter?

17   A.  Yeah.

18   Q.  Does he mumble?

19   A.  At times, yes.

20   Q.  During the conversation during the audio recording did

21   he discuss the pills that he was found to be in possession

22   of earlier in the morning?

23   A.  He did.

24   Q.  What did he tell you about the pills?

25   A.  He had told me that they were approximately 50 to 100
```

1    and he considered those personal use.

2    Q.  Did he tell you how much he paid for these pills?

3    A.  He did.

4    Q.  How much did he pay for the pills?

5    A.  He had told me $15 apiece.

6    Q.  And did he say that he got a deal on those for any

7    reason?

8    A.  He told me he got a deal on those because he buys in

9    bulk.

10   Q.  And did he -- did you guys discuss what those pills

11   typically cost if you are going to buy them for personal use

12   on the street?

13   A.  Yes, we did.

14   Q.  How much did those fentanyl pills typically cost on the

15   street?

16   A.  Average price is 30 to 35 apiece.

17   Q.  But he paid 15, he said?

18   A.  He said that, yes.

19   Q.  Did he also acknowledge his arrest in Oklahoma in

20   January of 2020?

21   A.  He did.

22   Q.  But you guys didn't get into that too much, right?

23   A.  We did not.

24   Q.  Now, during -- and this was a relatively brief

25   conversation with Mr. Elmi.  This only lasted several

1  minutes; is that right?

2  A.  10 to 15 minutes.

3  Q.  And during this conversation did you notice anything

4  about Mr. Elmi that was different from all the other times

5  that you interacted with him?

6  A.  No.

7  Q.  Did he appear to you that he was overly tired or sleepy?

8  A.  No.

9  Q.  Obviously, you knew the incident occurred at 3 a.m.  Did

10  he appear tired at all to you?

11  A.  I would say he appeared tired, but not to the point

12  where he couldn't function.

13  Q.  Did he appear to understand your questions by responding

14  to them?

15  A.  Yes, he did.

16  Q.  Did you notice anything strange about his demeanor?  For

17  example, did he appear to be under the influence of any

18  drugs or alcohol?

19  A.  Not that I could tell.

20  Q.  So can you tell the court, compared to any other

21  conversation you've had with Mr. Elmi, which, again, you

22  have mentioned as being countless, was he acting or

23  responding to you in any different way than he has in the

24  past?

25  A.  No.  I'd say that conversation was an accurate display

1   of how I had normally talked to him previously.

2   Q.  And you did have other -- you did have another role,

3   like you counted the pills in this case and sent them to the

4   BCA; is that right?

5   A.  I did.

6   Q.  But for the purposes of this hearing, does that

7   essentially include your involvement with these stops and

8   the statements that were made resulting in Mr. Elmi and the

9   indictment in this case?

10  A.  Yes.

11  Q.  Thank you, Officer Dauble.  I don't have any further

12  questions for you at this time.

13          THE COURT:  Okay, Mr. Kushner.

14          MR. KUSHNER:  One second.

15          THE COURT:  Sure, you can have a minute.

16          Officer Dauble, those bottles of water are clean,

17  if you're looking for a drink.  We're not doing cups right

18  now.

19          THE WITNESS:  All right.  Thank you.

20          THE COURT:  And I should say they contain water.

21          THE WITNESS:  Thank you.

22          MR. KUSHNER:  I'll go to the lectern, if that's

23  okay.

24          THE COURT:  Yeah, that would be fine, Mr. Kushner.

25  Come on up to the lectern, if you are comfortable with that.

```
 1                       CROSS-EXAMINATION
 2   BY MR. KUSHNER:
 3   Q.  Good afternoon, Officer Dauble.  I was looking at my
 4   watch to confirm it was the afternoon.  I don't think we met
 5   before.  I represent Mr. Elmi.
 6            So on the -- first of all, we'll go over the stop
 7   back on June 1st of 2019.  And so you testified that you
 8   were not on duty when that stop happened.
 9   A.  That's correct.
10   Q.  And what kind of realtime updates did you get on the
11   stop?
12   A.  I was making the call to Sergeant Peltz, who was the
13   head of the team that night.  And then --
14   Q.  Who?
15   A.  Sergeant Peltz, George Peltz.  He was the sergeant
16   working that night.  And then as soon as the stop was
17   concluded, everything was under control, what we call code
18   four, he gave me a call back immediately and told me what
19   they had found.
20   Q.  So you didn't actually -- you weren't actually observing
21   anything that happened on video?
22   A.  Not at -- not live, no.
23   Q.  And were you -- you weren't tuned into the radio at the
24   time.  There's a radio.  And, I mean, normally if you are on
25   duty, you might monitor what's going on based on the
```

1    electronic transmissions or radio calls; is that right?

2    A.  Yes.  I had my portable radio with me and turned on

3    during that, but I wasn't actually personally there.

4    Q.  All right.  And so you had -- the radio didn't -- didn't

5    like broadcast what was happening, you know, as it was

6    happening?

7    A.  I'm confused on what you are asking.

8    Q.  What was, what was, what was, the radio -- what was --

9    what was stated on the radio?  What kind of information do

10   you get from having the radio on?

11   A.  Just I turned it on once I give them information.  I

12   wanted to hear if anything happened, I guess, with it.

13   Q.  And so, what, can anybody hear what happens based on

14   listening to the radio?

15   A.  I just heard them air the traffic stop, that they found

16   the car.

17   Q.  Okay.  But nothing -- none of the actual interactions

18   that took place at the stop?

19   A.  Correct.

20   Q.  Okay.  Now, you said that, you know, this stop initiated

21   because you got a call from this informant.

22   A.  That is correct.

23   Q.  And what -- can you identify any cases in court that,

24   you know -- you said he brought about successful

25   prosecutions?

1    A.  Yes.

2    Q.  Can you identify any cases that were successfully

3    prosecuted as of the time that this incident happened based

4    on his information?

5    A.  Not -- I'm sorry.

6             MR. WESLEY:  I would just object.  I don't object

7    to the question being asked, can he identify the cases, but

8    I don't want him identifying any actual cases, because that

9    could lead to the identity of the informant.  So my

10   objection is to the informant's privilege.

11            THE COURT:  All right.  So you can answer this

12   question yes or no, Officer --

13            THE WITNESS:  Dauble.

14            THE COURT:  I apologize.  Yes, Dauble.  I was

15   going to say Daubert, but I knew that wasn't right.  Officer

16   Dauble.

17            And then, Mr. Kushner, if you have a follow-up

18   question, then I'll deal with the objection then.

19            THE WITNESS:  So can you just reask your question

20   one more time, please?

21   BY MR. KUSHNER:

22   Q.  Are you able to identify specific cases that were --

23   have been successfully prosecuted as of the date of this

24   incident on June 1st, 2019, based on information provided by

25   this informant?

1    A.  Yes, I could.

2    Q.  And how many?

3    A.  Without looking at my case files, I couldn't give you an

4    exact number.

5    Q.  Was it more than five?

6    A.  I would say so, yes.

7    Q.  And when you say successfully prosecuted, do you mean

8    that there were actual convictions based on information he

9    provided or just that people were arrested?

10   A.  On several there was charges brought by Hennepin County.

11   I haven't followed these cases through the court process, so

12   I couldn't tell you convictions or -- at this point.

13   Q.  So I think, at least for us who are officers of the

14   court, a successful prosecution would mean a conviction.

15   But you don't know of any convictions that had been had as a

16   result of the confidential informant's information as of

17   June 1st of 2019?

18   A.  I think they were all going through the process at that

19   time.

20   Q.  You don't know what the results of any -- you don't know

21   if any of them had even been completed at that time?

22   A.  I -- I don't.  I'm not aware of it.

23   Q.  All right.  But you said you had been working with this

24   person for six to eight months before the incident?

25   A.  Approximate time, yes.

```
 1    Q.  All right.  And are you aware that normally the court

 2    process takes longer than that?

 3    A.  It can, yes.

 4    Q.  And so you don't know how many cases -- how many cases

 5    he actually provided to you?

 6    A.  Off the top of my head, no.

 7    Q.  Do you have that information listed someplace?

 8    A.  I would just have to look at the police reports that

 9    I've filed in the past.

10    Q.  Okay.  And without naming any cases, could you name any,

11    if you were asked to, could you name anyone, any person that

12    was prosecuted as a result of this confidential reliable

13    informant as you sit here today?

14              MR. WESLEY:  I'm going to object as to the

15    informant's privilege, Your Honor, because that could lead

16    to the identification of the informant.

17              MR. KUSHNER:  And I was very specific in my

18    question.  I didn't ask him to identify.  I'm just asking

19    foundation --

20              COURT REPORTER:  I cannot hear you, Mr. Kushner.

21              MR. KUSHNER:  I'm just asking -- let me take off

22    my mask.

23              THE COURT:  Take your time.  It's easy to get

24    tangled up.

25              MR. KUSHNER:  So, yeah, I asked my question
```

1    specifically to lay foundation and that I didn't ask him at

2    this point to identify people.  I just asked him if he would

3    be able to identify specific people if he was asked.

4              THE COURT:  Why don't we have you reask the

5    question so that we can all hear it clearly, and then we

6    will see if there's an objection or not.

7              MR. KUSHNER:  All right.

8    BY MR. KUSHNER:

9    Q.  If -- without identifying anyone, would you be able to

10   identify specific people who were -- who were prosecuted as

11   a result of information provided by this informant prior to

12   June 1st of 2019?

13   A.  I feel like you are asking me two questions there,

14   without -- without identifying and specifically identifying.

15   Q.  Well, I guess I'm asking if you could identify any

16   specific people.

17   A.  Could I?  Yes.

18   Q.  How many?

19   A.  Like I said, without reviewing my police reports in

20   front of me, I couldn't give you a finite number.

21   Q.  My question is without reviewing or -- if I asked you to

22   identify people, you know, without reviewing your police

23   reports, just based on your recollection here today, would

24   you be able to identify any specific people?

25   A.  Yes, I would.

CROSS (KUSHNER)

1   Q.  And how many?

2   A.  Well, I guess that I couldn't give you a finite number.

3   I'd say probably over ten.

4   Q.  You would be able to name them right here -- right here

5   and now?

6   A.  Yes, likely.  Several of them.

7   Q.  So how many could you name?  I mean, without naming

8   anyone, if you were to answer that question, tell me how

9   many names you could give us.

10  A.  I just told you I could do several.

11  Q.  Well, count them in your head and tell me how many.

12  A.  I guess I'm not sure what you are looking for.  Off the

13  top of my head, you know, four or five right away.

14          MR. KUSHNER:  You know, I understand that the

15  court wouldn't want the -- want anyone identified in open

16  court, but I would like to pursue that for purposes of the

17  witness's credibility to see if he can actually identify

18  people.

19          THE COURT:  I'm not going to waive the informant's

20  privilege based on the testimony and -- that we have so far

21  in the absence of briefing.  So, Mr. Kushner, this is

22  already the subject of one of your motions, I believe,

23  correct?

24          MR. KUSHNER:  I did ask to -- for information

25  about the informant.

1    THE COURT:  Right.  And if you are asking for

2    advance permission to get the names of other informants in

3    other cases -- sorry -- other cases that have been

4    successfully prosecuted, the government has made an

5    objection to that.  I guess I'm not going to give you

6    advance permission to do that.  If you want to ask the

7    question and the government objects, I will deal with the

8    objection.

9    BY MR. KUSHNER:

10   Q.  Okay.  What, what -- which people who were successfully

11   prosecuted as of June 1st, 2019, as a result of this

12   informant's information?  Can you name those people?

13   MR. WESLEY:  Objection, Your Honor, because

14   informant's privilege.

15   THE COURT:  The objection is sustained.

16   BY MR. KUSHNER:

17   Q.  All right.  And so -- so on June 1st of 2019 did you

18   call this informant or did he or she call you?

19   A.  The informant called me.

20   Q.  And who did the -- which people did the informant

21   identify as driving, being in -- being present in this

22   vehicle?

23   A.  I was specifically told that Fahad Elmi and several

24   others were in this vehicle.

25   Q.  Okay.  Did he -- did he name anyone else besides Fahad

1    Elmi?

2    A.  I don't recall.

3    Q.  Did they -- you said that the person said that there

4    were pills in the vehicle?

5    A.  Yes.

6    Q.  And what kind of pills?  How did you describe the pills?

7    A.  They were described to me as being Percs or MBox.  I

8    can't remember the exact term.

9    Q.  Okay.  And did he -- did he say where the pills were?

10   A.  The informant did not tell me exactly in the car where

11   they were.

12   Q.  All right.  It's your testimony, though, that he told

13   you that the firearm was in the trunk?

14   A.  Yes, the informant told me that.

15   Q.  Did you previously prepare a police report shortly after

16   the incident that described what the informant told you?

17   A.  I believe I completed one the next day when I got to

18   work.

19   Q.  Okay.  And so that would have -- and so the purpose of

20   providing a police report as soon as you can after the

21   incident is probably because your recollection is fresh at

22   that time; is that right?

23   A.  Yes.

24   Q.  All right.  Did you happen to review the police report

25   that you prepared prior to your -- in preparation for your

 1    testimony today?

 2    A.  I did a few -- several days ago, yes.

 3    Q.  Okay.  The police report didn't mention anything about

 4    where the firearm was located, did it?

 5    A.  I don't believe so.

 6    Q.  Okay.  So if I -- if I told you the police report just

 7    says that there's a firearm in the vehicle, but it doesn't

 8    say anything about where it's located in the vehicle, you

 9    would agree with that?

10    A.  Yes.

11    Q.  And that would have been relevant information to include

12    in your police report, if he'd actually given you that

13    information?

14    A.  It depends, I suppose.

15    Q.  Well, the prosecutor has elicited testimony that the

16    firearm was found, you know, where the informant said it

17    would be found.  Do you recall that testimony?

18    A.  Yes.

19    Q.  And but -- so it would be relevant if the informant

20    provided you information about where the firearm was because

21    it would confirm his reliability, right?

22    A.  That I suppose would be accurate, yes.

23    Q.  Okay.  But you didn't include anything in the report

24    about where the informant claimed the firearm was located?

25    A.  Correct.

1    Q.  And that's because he didn't -- he didn't give you that

2    kind of specific information?

3    A.  No, that's not correct.

4    Q.  So that's something -- you're just testifying from your

5    recollection more than two years since the incident?

6    A.  Yes.

7    Q.  And that's something that you didn't actually include in

8    your police report at the time.

9    A.  Yes; I did not.

10   Q.  And it was more than two years ago, right?

11   A.  Doing the math, yeah.

12   Q.  Okay.  You said that you're very familiar with Mr. Elmi.

13   Can you specify when you first met him, you know, date-wise

14   or like, you know, down to a month or a year?

15   A.  I couldn't give you a specific even month, I suppose.  I

16   was assigned to the -- what they call Cedar-Riverside beat

17   car I think roughly in 2017, which I spent most of my time

18   where he used to live.

19   Q.  Okay.  So -- so it would have been in 2017 or afterwards

20   that you first met him?

21   A.  It could have been before, but I know I spent a majority

22   of my time in his neighborhood in 2017.

23   Q.  You can't, as you sit here, you can't testify as to the

24   specific -- even the specific year when you first met him?

25   A.  No, I can't.  I've met thousands of people.

EROS (REDIRECT/CROSS (ROGHAIR)
61

1    Q.  Could it have been 2018?

2    A.  I knew him before I got to the gang unit in 2018.

3    Q.  And when in 2018 did you get to the gang unit?

4    A.  I think I testified it was the end of the summer, maybe

5    August.

6    Q.  And you -- did you have -- how many contacts did you

7    have with him after you got into the gang unit?

8    A.  I couldn't give you a finite number.  I mean, countless

9    at this point.

10   Q.  And when you say contacts, did you actually speak with

11   him or you just -- you drove through?

12   A.  Both.

13   Q.  And are you aware that Mr. Elmi has an addiction to

14   fentanyl?

15   A.  He alleged that to me once, yes.

16   Q.  Okay.  You don't have any personal knowledges or

17   observations about whether or not he's addicted?

18   A.  I'm not a medical professional.

19   Q.  Did you ever observe him using drugs?

20   A.  Using, no.

21   Q.  You did find him to be in possession of drugs?

22   A.  On several occasions.

23   Q.  Did he tell you that he was a user?

24   A.  Excuse me?

25   Q.  He did tell you that he was a user?

1    A.  He told me that, yes.

2    Q.  And you've, I mean, you've followed the case since he

3    was arrested, right?

4    A.  Yes.

5    Q.  And so you are aware that he's made attempts at

6    treatment?

7    A.  I'm not aware of that.

8    Q.  And so during the times that you -- that you encountered

9    Mr. Elmi, you don't know whether he was under the influence

10   of drugs or not?

11   A.  I couldn't tell at that time, no.

12   Q.  Do you know what the -- are you familiar with the

13   effects of fentanyl?

14   A.  I am.

15   Q.  And what kinds of effects does it have?

16   A.  It's an opiate, so it's more of a depressant, makes

17   people slow down a lot, kind of mopey.

18   Q.  And you testified that Mr. Elmi talks slower than the

19   average person?

20   A.  Yes, I did.

21   Q.  And he also speaks at a lower volume?

22   A.  Yes.

23   Q.  And would that be consistent with someone using opiates?

24   A.  It could be, yes, but the times I talked to Elmi every

25   single time he acted that way, unless he was under the

1    influence every time I spoke to him.

2    Q.  He could have been under the influence every time,

3    right?

4    A.  He didn't exhibit any other signs other than his speech

5    or -- I mean, he wasn't stumbling, he wasn't falling asleep

6    when I talked to him, like most users do.

7    Q.  This interview you had with him on September -- was it

8    September 16th of 2020?

9    A.  I'm not -- if that's the specific date, then --

10   Q.  It was only -- it was only -- it was only about

11   15 minutes, right?

12   A.  Yes, sounds about right.

13   Q.  So on -- so going to -- continuing with the

14   September 15th of 2020, do you know what time Mr. Elmi was

15   arrested that night?

16   A.  I believe the counsel here said it was approximately

17   three in the morning.

18   Q.  That he was arrested then?

19   A.  I believe.  I don't have that approximate time in front

20   of me.

21   Q.  And do you know what time you interviewed him?

22   A.  I believe it was afternoon sometime.

23   Q.  Okay.  Could it have been at night?

24   A.  It was during -- I work during day hours, so it would

25   have been during the day.

```
1    Q.  So what shift did you work that -- at that time?

2    A.  I usually work 9 to 5 or so.

3    Q.  And had Mr. Elmi been in jail from the time of the

4    incident where he was arrested until you met with him?

5    A.  I believe so, yes.

6    Q.  And did you meet with him in the jail?

7    A.  I did.

8    Q.  And at the time he spoke slowly and in a low volume?

9    A.  As other times in the past, yes.

10   Q.  And he was also sometimes hard to understand?

11   A.  To hear.

12   Q.  To hear?

13   A.  Yes.

14   Q.  And are you aware that shortly after that he was taken

15   to the hospital for withdrawal symptoms?

16   A.  No, I'm not aware of that.

17   Q.  You're not denying it?  You just don't know either way?

18   A.  I don't -- I'm not -- have access to jail records.

19             MR. KUSHNER:  I just want to have a moment.

20             THE COURT:  Okay.

21   BY MR. KUSHNER:

22   Q.  Did you tell mister -- in this interview on

23   September 15th or 16th, 2020, did you tell Mr. Elmi that he

24   looked fucked up?

25   A.  I can't recall specifically what I said without
```

1    listening to the audio right now.

2    Q.  So you haven't listened to it recently?

3    A.  Not this morning, no.

4    Q.  Now, was your whole encounter with him recorded, or did

5    you turn the recorder on at a certain point?

6    A.  I turned the recorder on once I entered -- or got to the

7    cell door, because the sergeant in the jail had the key to

8    the door, but I think you can hear that in the audio.

9         MR. KUSHNER:  Yeah, I have no other questions at

10   this time.

11        THE COURT:  Thank you, Mr. Kushner.

12        Mr. Wesley, do you have any redirect?

13        MR. WESLEY:  Yes, Your Honor.

14                    REDIRECT EXAMINATION

15   BY MR. WESLEY:

16   Q.  Officer Dauble, just to be very clear about what the

17   information was that you received from the CRI on June 1st

18   of 2019, could you tell the court what that information was?

19   A.  I was -- received information from a plate number,

20   vehicle description, approximate location.  A vehicle was

21   located where Fahad Elmi was selling or possessing MBox

22   pills, and they had a firearm in the vehicle.

23   Q.  So with regard to the firearm, the description was it

24   was in the vehicle; is that right?

25   A.  Yes.

CROSS-EXAMINATION - BROOKS BAZELEY

1    Q.  But there was no specific area of the vehicle that the

2    informant said it would be found?

3    A.  It was in the vehicle, is what I was told.

4    Q.  Okay.  Turning your attention to a different subject,

5    you mentioned, you know, in addition, fentanyl users falling

6    asleep.  Backing up a little bit, have you encountered

7    persons who you know who have recently ingested fentanyl and

8    had the opportunity to observe them and speak with them?

9    A.  Yes, I have.

10   Q.  And what types of things are pretty common amongst

11   persons that use and abuse these MBox or Percs or whatever

12   they call them, but these blue little pills with the M on

13   them?  What are some of the common characteristics of a

14   person who use these fentanyl pills?

15   A.  So these pills have fentanyl, which is -- I can't give

16   you the exact number, but so many times stronger than, say,

17   heroin or other depressants that are on the street, so they

18   hit a lot harder on people.  The effects are a lot stronger.

19   So most people are nodding off, where they can't stay awake.

20   They can't normally walk or function like a normal person

21   would.

22   Q.  Did you notice any of those indicia of fentanyl

23   impairment when you were speaking with Mr. Fowzi on

24   September 15th of 2019?

25   A.  No.  At the time he was sitting on a bench and was able

1   to hold himself upright and wasn't swinging side to side or

2   acting like he was under the influence.

3   Q.  Now, you can't recall exactly what was said on the

4   recording, but let's say -- well, what did you know about --

5   strike that.  Sorry.  What did you know about why Mr. Elmi

6   was in the jail at the time you interviewed him on

7   September 15th of 2019?

8   A.  So prior to going to the jail, I read the responding

9   officers' police reports and watched their body camera

10  footage, so --

11  Q.  So were you aware that Mr. Elmi was in a vehicle that

12  was involved in a car crash?

13  A.  It was a minor accident, yes.

14  Q.  So if you did say something to the effect of "You look

15  fucked up" -- and I'm not saying you said it.  Frankly,

16  whether you did or not, it doesn't matter.  But if you did

17  say something like that, was it in reference to him looking

18  like he was under the influence of fentanyl?

19  A.  No.

20  Q.  And just with regard to the timing of it, if Exhibit 17

21  says you note a time of 12:12, what time would that be?

22  A.  That would be 12:12, afternoon.

23  Q.  p.m.?

24  A.  p.m., correct.  Yes, yes.

25  Q.  Because you work during the day?

CROSS-EXAMINATION - KUSHNER

```
 1    A.  Yes.

 2    Q.  Thank you, Officer Dauble.  I don't have further

 3    questions for you at this time.

 4    A.  Thank you.

 5              THE COURT:  All right.  Mr. Kushner, do you have

 6    any recross based on that redirect?

 7              MR. KUSHNER:  Very briefly.

 8                       RECROSS-EXAMINATION

 9    BY MR. KUSHNER:

10    Q.  Is there any way that you observed Mr. Elmi that would

11    lead you to believe that he looked messed up?

12    A.  Could you --

13              MR. WESLEY:  I'm sorry, Your Honor.  I couldn't

14    hear the question.

15    BY MR. KUSHNER:

16    Q.  Is there anything you observed about Mr. Elmi that would

17    have led you to believe or say that he looked messed up?

18    A.  I didn't see anything like physical injuries, if that's

19    what you mean by "messed up."

20    Q.  Okay.  And so if you did say that, as you sit here, do

21    you know what you would be referring to?

22    A.  No.  I -- Mr. Elmi and I kind of joke around a lot.

23    We've had a decent relationship up until now, you know.

24    We're likely going back and forth.

25    Q.  I see.  But did you normally say things if you don't
```

1    mean them?

2    A.  No, I don't.

3            MR. KUSHNER:  Okay.  I have no further questions.

4            THE COURT:  Okay.  Thank you.

5            Officer Dauble, you may step down.  Thank you.

6            THE WITNESS:  Thank you.

7            THE COURT:  And, Mr. Wesley, if you want to call

8    your next witness.

9            MR. WESLEY:  I do, Your Honor.  I'm actually --

10   I'm not sure what the court's plan is for scheduling, but I

11   do have an overnight officer.  I was going to call him last,

12   but I'm going to get him on, so hopefully he can go home and

13   sleep.  So the officer -- we'll be calling Officer Miguel

14   Martinez.  And this involves the September 15th incident.

15           THE COURT:  Okay.  While your agent is getting

16   Officer Martinez, it looks like we will be going into the

17   afternoon.  So I expect probably after mister -- or excuse

18   me -- Officer Martinez testifies, we will take a recess for

19   a short period of time for a number of reasons, including

20   biological and to allow people to eat.

21           MR. WESLEY:  Your Honor, may I excuse the other

22   witness and tell him to come back at a certain time?

23           THE COURT:  Sure.  How long do you think Officer

24   Martinez's testimony will take?

25           MR. WESLEY:  I'm hoping that I will have him on

1    and off the stand in 20 minutes.  That's for my questioning.

2              THE COURT:  Okay.  And then I expect there will be

3    some cross-examination.  So why don't you tell them to come

4    back at 1:15?  Thank you.

5              MR. WESLEY:  Thank you, Your Honor.

6              THE COURT:  Thank you.

7              Okay.  Officer Martinez, if you want to come

8    through and then walk around behind that big rectangular

9    block, and then you can come on up to the witness stand that

10   way.  And I'm going to put you -- I'll swear you in first.

11   If you can raise your right hand, please.

12                        MIGUEL MARTINEZ,

13   called on behalf of the government, was duly sworn, was

14   examined and testified as follows:

15             THE WITNESS:  I do, Your Honor.

16             THE COURT:  Okay.  Thank you.  And you may sit

17   down.  Officer Martinez, witnesses are permitted to remove

18   their masks, if they want to, when they're testifying.

19             THE WITNESS:  All right.

20             THE COURT:  And then I will let Mr. Wesley proceed

21   with his examination.

22             MR. WESLEY:  Thank you, Your Honor.

23                        DIRECT EXAMINATION

24   BY MR. WESLEY:

25   Q.  Officer Martinez, could you please tell the court how

 1   long you've worked for the Minneapolis Police Department?

 2   A.  Yes, sir.  I start as a CSO, so I start in 2016, and I

 3   was a CSO for about two years.

 4            THE COURT:  Okay.  Let me stop you.  First of all,

 5   let's get his full name on the record.

 6            And then, Officer Martinez, if you can talk a

 7   little bit slower and talk into the mic so that our court

 8   reporter can hear you.

 9            THE WITNESS:  Okay.

10            THE COURT:  Thank you.

11   BY MR. WESLEY:

12   Q.  Officer Martinez, could you please state your full name

13   for the record?

14   A.  Yes, sir.  First name Miguel.  My middle name Andres.

15   And then last name Martinez Suarez.

16            MR. WESLEY:  Any spelling necessary?

17            COURT REPORTER:  Could you say your last name

18   again?  Martinez Juarez?

19            THE WITNESS:  Suarez.

20            COURT REPORTER:  Could you spell that, please?

21            THE WITNESS:  Yes, ma'am.  S-U-A-R-E-Z.

22            COURT REPORTER:  Thank you.

23   BY MR. WESLEY:

24   Q.  Officer Martinez, have you testified more than once in a

25   court before?

1    A.  Yes, sir.

2    Q.  You have more than once?

3    A.  Oh, no.  Just one.  Yeah, just one.

4    Q.  Well, I'll just advise you that it's very important to

5    speak loudly, clearly, and slowly, so everybody can

6    understand you.  And I'm an offender of this a lot.  I'm

7    sure the court reporter can tell you.  But it's important to

8    make sure that everyone can hear you over the microphone.

9    Okay?

10   A.  Yes, sir.

11   Q.  So please tell the court how long you have been working

12   as a Minneapolis police officer.

13   A.  I've been with the police office for four years right

14   now.

15   Q.  So roughly did you say 2016, 2017?

16   A.  As an officer, '18, so yeah.

17   Q.  So 2000 -- when did you start?  What year?

18   A.  As an officer, 2018.

19   Q.  So you started as an officer in 2018?

20   A.  Mm-hmm.

21   Q.  And is it fair to say that you've mostly worked

22   overnight shifts?

23   A.  For the most part, yes.

24   Q.  Is it fair to say that you worked overnight last night?

25   A.  Yes, I did.

1    Q.  You've been awake for a long period of time at this

2    point?

3    A.  I have.

4    Q.  All right.  So let me know if you need clarification to

5    any of my questions.  But we are here to talk about an

6    incident that occurred on September 15th of 2020, right?

7    A.  Yes, sir.

8    Q.  And could you tell the court the general nature of the

9    call that you were responding to on that date?

10   A.  Yes, sir.  Initially we were going to an accident PD.

11   That was the initial call, so --

12   Q.  And when you say "PD," do you mean property damage?

13   A.  Correct.

14   Q.  And when you were responding to this call, did you have

15   any information about the whereabouts of the driver or

16   occupants that were in the crash?

17   A.  Per the remarks in the call that night, it says that the

18   person -- I mean, there was about three occupants and they

19   have left the scene.  So by the time, you know, like we were

20   going there, we thought they were gone from the scene.

21   Q.  So you were expecting to respond to a scene where there

22   were two vehicles crashed into each other and no one was

23   going to be there?

24   A.  Correct.

25   Q.  And the other vehicle that was crashed into, was that a

1    parked, unoccupied vehicle?

2    A.  Yeah, I believe so.  Yes.

3    Q.  And because, for the court, this occurred shortly after

4    3 a.m.; is that right?

5    A.  Yes.

6    Q.  So you get on scene.  Were any of the three -- the three

7    reported occupants of the vehicle at the scene right when

8    you got there?

9    A.  Yes sir.  When we arrived, there were two males by the

10   vehicle and there was a third one leaving the scene.

11   Q.  And could you please describe for the court who you

12   interacted with first?

13   A.  As soon as I got out of my squad car, I saw two males by

14   the crash, the two vehicles crashed, kind of arguing.  And

15   then my partner stay with those two.  And then I saw the

16   third male, you know, turning around the corner, so I just

17   went and grabbed him.

18   Q.  And what was this other person doing as you turned the

19   corner and saw them?  What did they say they were doing

20   actually?

21   A.  Well, he -- he was saying that he was urinating, so --

22   Q.  And to be clear, this third individual was not the

23   defendant Mr. Elmi?  It was one of the other occupants?

24   A.  It was a different person, yes.

25   Q.  So you grabbed this person who said he was urinating.

1    And he was by some bushes, right?

2    A.  Correct.

3    Q.  And what did you do with him?

4    A.  I told him to stop doing that and come back to the scene

5    so we can talk, I mean, just bring him back to the scene, so

6    I can help out my partner.

7    Q.  How would you describe this person's demeanor that you

8    were dealing with?

9    A.  The one I grab from the corner?

10   Q.  Yes, that individual.

11   A.  Yep.  For the most part he was, you know, compliant, for

12   the most part.  I mean, I was just trying to make sure he

13   was okay, since he probably was related to the PD.  So he

14   was compliant.

15   Q.  Did he -- did he tell you that he was involved in the

16   crash?

17   A.  Yep.  As we were walking back to the, you know, where

18   the vehicles were, he was saying that he was inside the

19   vehicle with two more people and then that one of the people

20   was the owner of the vehicle.

21   Q.  Did he tell you who was driving the vehicle?

22   A.  He state -- he didn't tell me, but he said that there

23   was a male that didn't have a shirt at the moment, when I

24   was coming back, that was the owner.  He didn't specify who

25   was -- who was the driver, though.

1    Q.  And so just to be clear, as you're investigating a car

2    crash where there's property damage crashing into a parked

3    car, do you want to know who the driver is?

4    A.  If we can get that from the people on scene, yes.

5    Q.  So this is all captured on your body camera, right?

6    A.  Yes, it was.

7    Q.  And you had the opportunity to review your body camera

8    yesterday and then I assume on your own time; is that right?

9    A.  Yes.

10   Q.  And is it a fair and accurate copy of what you heard and

11   observed in your response to this car crash around 3 a.m. on

12   September 15th, 2020?

13   A.  Yes.

14           MR. WESLEY:  Your Honor, I would offer that.  It's

15   the BWC marked 15 on the disk.

16           THE COURT:  So Exhibit 15?

17           MR. WESLEY:  Exhibit 15, Your Honor, yes.

18           THE COURT:  All right.  Mr. Kushner, any

19   objection?

20           MR. KUSHNER:  No objection.

21           THE COURT:  Okay.  Exhibit 15 is admitted for the

22   purposes of the pending motions.

23   BY MR. WESLEY:

24   Q.  Did you end up speaking with an individual, again, not

25   the defendant, but one of the other three persons that were

1    in the car, who was seated in the backseat of your squad?

2    A.  So once I got back to the crash site, like I said, there

3    was two -- two males that were kind of arguing.  So I ended

4    up just grabbing one of those, and I was trying to just, you

5    know, kind of deescalate the situation at the moment.  So I

6    took one of the males back to my squad.

7    Q.  And maybe we should -- maybe we should get some names

8    here.  So one of the persons you dealt with was Fowzi Elmi;

9    is that right?

10   A.  Correct.

11   Q.  Was Mr. Elmi one of the persons that was arguing that

12   you had to separate them to deescalate the situation?

13   A.  Yes, he was.

14   Q.  And so the other person was the one you brought back to

15   the squad car, right?

16   A.  Correct.

17   Q.  And when you spoke with this person, could you describe

18   for the court just in general what their demeanor was and

19   what was being discussed?

20   A.  The male was really frustrated.  He was kind of in

21   between crying and complaining about his vehicle being

22   damaged.  One of the reasons why I took him back was because

23   he was the one that looked to me that was in more distress

24   at the moment.  So one of the things I was trying to do was

25   to get him to calm down to understand what actually

1    happened, so --

2    Q.  And this disturbance that was occurring between Mr. Elmi

3    and this individual, that was happening right in the middle

4    of the street; is that --

5    A.  Correct.

6    Q.  Did anyone else --

7              MR. KUSHNER:  You didn't even let the witness

8    answer.  I mean, are you going to just completely testify

9    for the witness?

10             THE COURT:  Is that an objection?

11             MR. KUSHNER:  Yes.

12             THE COURT:  And what's the objection?

13             MR. KUSHNER:  That the witness -- that the

14   prosecutor is testifying and didn't wait for the witness to

15   answer the question.

16             THE COURT:  I will overrule that objection.

17             Mr. Wesley, if you do want to slow down a little

18   bit with the questions, just to make sure we're getting the

19   full answer.

20             MR. WESLEY:  Yes, Your Honor.  And my apologies.

21   I thought I heard a "yes" before I continued.

22   BY MR. WESLEY:

23   Q.  But to reask the question, Officer Martinez, the

24   disturbance that was occurring between Mr. Elmi and the

25   person you brought back to your vehicle to deescalate the

EJ120-CR-00262-ADM-ECW (P20CE87

1   situation, as you said, that disturbance was occurring in

2   the middle of the street?  Is that correct or is that not

3   correct?

4   A.  That is correct.

5   Q.  Did any other individuals end up coming outside while

6   this was going on that was not one of the three persons

7   involved in the crash?

8   A.  Yeah.  In the meantime, while I was dealing with the

9   three people that, I mean, we figure was involved with the

10   crash, the owner of the parked vehicle actually came out,

11   you know, from his residence to talk to us to, you know, get

12   information I'm guessing for his insurance or whatever.  So,

13   yeah, there was a fourth person at this time.

14   Q.  So going back to talking with the individual who was

15   going back and forth between, you know, being upset and

16   crying, that person acknowledged that it was their vehicle;

17   is that right?

18   A.  Yes.  Yes, he did.

19   Q.  Did that person say that they were driving?

20   A.  No, he did not admit he was driving.  At the moment he

21   didn't, no.

22   Q.  Let's just jump to it.  At some point did you end up

23   going to the vehicle that was crashed that was occupied by

24   these three individuals at one point?

25   A.  Like I say, he was in a lot of distress, so he didn't

1    actually calm down, you know, completely.  So I offer, you

2    know, like I need your information, this is a crash, right,

3    so do you have an ID on him.  He didn't.  So I didn't want,

4    you know, these two people to start fighting again or, you

5    know, cause a scene, I offer to go back to the vehicle,

6    retrieve his ID and retrieve his insurance information for

7    the crash.

8    Q.  And did you leave this person uncuffed with the door

9    open sitting with his legs out in the backseat of the squad?

10   A.  I did.  He was kind of, you know, freaking out already.

11   So at the moment there was no need for me to do anything

12   else.  I ask him, you know, stay in the squad, I'll go get

13   the stuff, we'll get all this sorted out, and then you will

14   be on your way.

15   Q.  Can you tell the court what happened when you went back

16   to the vehicle looking for the driver's license and

17   insurance?

18   A.  Yeah.  So I open the driver door, because he close it,

19   and then I was just kind of, you know, like looking in the

20   places which more people, you know, will have stuff,

21   personal stuff, you know.  Open the door; there was nothing

22   there.  I was looking for his ID and his insurance, so

23   usually they're, you know, in the center console, left

24   compartment.  Right?  So I shine my light real quick; and

25   then as soon as I shine my light, there was, you know, like

FT 0:20-CR-00262-ADM-ECW   (DOC 87)

81

1    the opening, the car had like an open area in the middle, I

2    shine it quick, I glance over, and then I realized it was a

3    handgun in plain sight, so --

4    Q.  And at the time when you saw it, did you believe it to

5    be a handgun, an actual firearm, or something else?

6    A.  At the moment I have no clue what it was.  It looked to

7    me like it was a firearm, like a real one.

8    Q.  And at the moment that you saw a firearm, given the

9    circumstances of the situation that's captured on your

10   body-worn camera and you've been testifying about, what did

11   you do upon seeing that weapon?

12   A.  Well, once I realized there was a handgun, I mean, I

13   thought it was a real handgun, I told my partner, hey, you

14   know, we need to cuff everybody up, just, you know, to get

15   officer safety.  I mean, nobody was in cuffs at this point.

16   So my partner was dealing with two people.  I have a third

17   person in my squad.  So we handcuff everybody.

18   Q.  And in particular did you end up handcuffing and dealing

19   with Mr. Elmi, the defendant?

20   A.  I did end up dealing with the defendant, yes.

21   Q.  And did you end up searching him?

22   A.  I did.

23   Q.  And is that captured on your body camera?

24   A.  Yes, it was.

25   Q.  In your mind, what was your purpose for searching him at

1    that moment in time?

2    A.  I didn't have the time to confirm it was a real, you

3    know, a firearm, but in my mind at the moment it was.  So at

4    this moment everybody was under arrest for a possible

5    firearm, so incident to arrest he was searched.

6    Q.  And is it your understanding under Minnesota law that

7    having a firearm where you found it is a crime?

8            MR. KUSHNER:  Objection and leading.

9            THE COURT:  Overruled.

10            THE WITNESS:  For me at the moment it was the

11    thing that technically a crime was committed at the moment.

12    They leave the scene of a crash site.  Right?  So at the

13    moment I thought, yes, it was a crime.

14    BY MR. WESLEY:

15    Q.  And with regard to the specific location where the

16    firearm was found, where you saw it, where did you see it?

17    A.  It was in, like I say, it was in the middle, in the

18    center area, which is accessible for everybody in the

19    vehicle, so --

20    Q.  Is that why you ordered all three of them to be put

21    under arrest?

22    A.  Correct.

23    Q.  Yesterday did you review a photograph that was taken of

24    the firearm where it was found before it was moved?

25    A.  Yes.  Yeah, I took a picture of that area.

1    Q.  And that was a fair and accurate picture of where you

2    found the weapon before you actually took it into police

3    custody; is that right?

4    A.  That's correct.

5            MR. WESLEY:  Your Honor, that has been marked as

6    Exhibit No. 16, and the government offers Exhibit No. 16

7    into evidence.

8            THE COURT:  Any objection, Mr. Kushner?

9            MR. KUSHNER:  No, no objection.

10           THE COURT:  Okay.  Thank you.

11           Exhibit 16 is admitted for purposes of the hearing

12   and the motions.

13   BY MR. WESLEY:

14   Q.  As you were searching Mr. Elmi, did you find anything

15   concerning on his person?

16   A.  Yes.  After I finish emptying all his pockets, there was

17   I believe to be two bags of at the moment just narcotics

18   that would, you know, use as evidence, so --

19   Q.  And in your mind -- well, what did you do based on

20   finding narcotics on Mr. Elmi?

21   A.  Well, at the point, besides the firearm at the time, he

22   was, you know, he was under arrest for narcotics as well.

23   Q.  So at some point after the individuals had been searched

24   by you and other officers, did you or your fellow officers

25   have the opportunity to go back to the car and further

1    examine the weapon that was found in the center console?

2    A.  Yes.  After -- after the three of them were, you know,

3    properly secured, handcuffed and searched, and then I went

4    back to, you know, like photograph where the firearm was

5    located at and then I, I mean, what I usually do is make

6    sure that, Is it loaded, Is not loaded.  So when I was

7    trying to check if there was a round in the chamber, then I

8    realized it was an actual BB gun.

9    Q.  So essentially for the court's information, when you

10   check to see if a gun is loaded or not, what's the mechanics

11   of what you do?

12   A.  What I -- what I usually do is, first of all, remove the

13   magazine to make sure I don't drag another round into the

14   chamber.  And there was no magazine.  So after removing the

15   magazine, I will just drag the gun, the firearm, and then

16   make sure, you know, did the round eject or not and then the

17   chamber is clear.

18   Q.  So at the point you tried to eject the magazine,

19   realized there wasn't a magazine, you started to realize

20   that it wasn't a firearm; is that right?

21   A.  Correct.

22   Q.  And the weapon actually turned out to be a BB gun; is

23   that correct?

24   A.  Yes.

25   Q.  Now, based on your understanding of Minnesota law, is it

1    a crime to carry a BB gun in a car where it's not cased and

2    unloaded?

3    A.  Yes, sir.

4    Q.  So could you tell the court what happened -- ultimately

5    happened to all three of the individuals as a result of this

6    crash, your investigation in the street and finding this BB

7    gun?

8    A.  Well, like after we sorted everything out, we -- I

9    talked to my supervisors, and everything was done for, you

10   know, the possession of the BB gun for the three of them,

11   since it was accessible for everybody in the vehicle, and

12   then for the defendant we did PC narcotics.

13   Q.  But for all three of them it was probable cause for the

14   possession of the BB gun?

15   A.  Correct.

16   Q.  And then for Mr. Elmi it was the BB gun and the drugs?

17   A.  That's correct.

18   Q.  When you initially -- going back to when you initially

19   arrive on the scene and you are expecting no one to be there

20   based on the caller's report, can you tell the court when

21   you parked were the three individuals already in the area or

22   did they arrive back after you parked?

23   A.  Well, like I say, in the beginning per the remarks of

24   the call, it stated they were gone.  So I was assuming as I

25   was arriving that they will be gone.  But then when we got

1   closer to the scene and I see all kinds of vehicles, then I

2   saw the people in the vicinity of the incident.

3   Q.  And based on your training and experience, what is a

4   driver supposed to do when they strike a vehicle that's

5   unoccupied on the street?

6   A.  Well, if it all unoccupied -- well, at least call 911 to

7   call in a report.  And then me as an officer will try to

8   contact the second person for the parked vehicle.  So at the

9   bare minimum call 911 to report that they crash.

10  Q.  And was your 911 call from the occupants of the three

11  vehicle or was it from the owner of the parked car that was

12  crashed into?

13  A.  No.  It was from -- I believe it was the owner of the

14  parked vehicle.  Sorry.

15  Q.  Is the driver of the vehicle supposed to leave the scene

16  when they crash into a parked vehicle that's unoccupied?

17  A.  No, they're not supposed to leave the scene.

18  Q.  In looking back at your body-worn camera and your

19  recollection of what was going on in the middle of the

20  street, could you describe for the court the behavior of

21  Mr. Elmi and the other individual?  Be more specific about

22  what they were doing when you say there was an altercation

23  between the two.

24  A.  It was really unclear in the beginning why were they so

25  upset.  I mean, it was a crash.  Right?  So, I mean,

```
 1    everybody is going to be, especially the owner, will be
 2    upset of crashing.  But then after, you know, like we dealt
 3    with them on the situation and start, you know, turning to
 4    something different, the alleged owner of the vehicle, he
 5    was super -- you know, like he was really distressed about
 6    it.  He was frustrated, and he was crying.  And then the
 7    defendant, he was somewhat somehow compliant, although until
 8    I handcuff, and then he start, you know, like becoming more
 9    defensive and then --
10    Q.  I'm going to interrupt you.  I'm asking specifically
11    about when Mr. Elmi was with the other individual in the
12    street and then you made the decision that they needed to be
13    separated.  Right?
14    A.  Oh.
15    Q.  So before they were separated, what exactly were the two
16    of them doing that made you think, geez, I got to separate
17    these guys?
18    A.  They were pretty much, kind of, like pushing each other
19    and then being in each other's face.  So I didn't want that
20    to escalate to a fistfight or a tussle, where I have to
21    actually, you know, use force and my partner has to use
22    force.
23    Q.  But they were physically pushing one another?
24    A.  Correct.
25    Q.  And based on your training and experience, is that a
```

1     violation of Minnesota law?

2     A.  Yes.

3     Q.  And what violation would that be if you decide to cite

4     somebody for that?

5     A.  Assault.  Depending on how bad it could be, different

6     degrees of assault.

7     Q.  And is there fighting under disorderly conduct as well?

8     Are you familiar with that or no?

9     A.  Yeah.

10              MR. KUSHNER:  Objection.  Leading.

11              THE COURT:  Sustained.

12              MR. WESLEY:  I'm asking if he's familiar with it

13    or not, Your Honor.

14              THE COURT:  It's still sustained.

15    BY MR. WESLEY:

16    Q.  But assault is what you described?

17    A.  Correct.

18    Q.  When they shoved one another and you had the opportunity

19    to see Mr. Elmi and the other individual, did you note any

20    physical injuries to their persons?

21    A.  The person I dealt with, the alleged owner of the

22    vehicle, he -- I believe he was like a bloody nose or

23    something or he has some scratches on his arm.

24    Q.  And, in any event, all the -- the interactions at least

25    from the perspective of your body-worn camera was captured

1    in Exhibit 15; is that right?

2    A.  Correct.

3    Q.  Thank you, Officer Martinez.  I don't have any further

4    questions for you at this time.

5              THE COURT:  Okay.  Mr. Kushner, do you have

6    cross-examination?

7              MR. KUSHNER:  Yes, I do.  Judge, before we get

8    going, can I take a break for a few minutes?

9              THE COURT:  Why don't -- this is for personal

10   reasons, I assume?

11             MR. KUSHNER:  Hmm?

12             THE COURT:  Do you need to look at your notes,

13   or is it for personal reasons?

14             MR. KUSHNER:  Relieve myself.

15             THE COURT:  Yep, understood.

16             Okay.  Why don't we take a 5-minute recess for

17   everyone.

18             And I will remind the witness that he will

19   obviously remain under oath when we come back.

20             MR. KUSHNER:  Thank you.

21             THE COURT:  We're in recess.

22             THE CLERK:  All rise.

23             (Recess taken at 1 p.m. until 1:10 p.m.)

24             THE COURT:  We are back on the record in United

25   States versus Elmi, Case No. 20-cr-262(ADM/ECW).

```
 1                    Officer Martinez, as I said, you are still under
 2        oath.
 3                    THE WITNESS:  Yes, Your Honor.
 4                    THE COURT:  Okay.  Mr. Kushner, I'm happy to have
 5        you proceed now.
 6                    MR. KUSHNER:  Yes.  Thank you, judge.
 7                            CROSS-EXAMINATION
 8        BY MR. KUSHNER:
 9        Q.  Good afternoon, Officer Martinez.  My name is Jordan
10        Kushner.  I'm the attorney for Fowzi Elmi.
11        A.  How are you doing, sir?
12        Q.  Pretty good.  Did you prepare a report about this
13        incident shortly after it happened?
14        A.  I did, sir.
15        Q.  And is that common practice, if you make an arrest, to
16        do a narrative report to explain what happened?
17        A.  Usually by the end of your shift, yes.
18        Q.  And then the narrative report would include all the
19        important information or relevant information about the
20        incident?
21        A.  It should, yes, sir.
22        Q.  And does that -- did you prepare the report shortly
23        after it happened?
24        A.  It's fair to say, sir, yeah.
25        Q.  Like within an hour or two?
```

1    A.  Yeah, I would say little more, because it took us a

2    while to take care of the scene, but, like I said, before my

3    shift ended that day, yes.

4    Q.  And you would have put the, you know, put any pertinent

5    details in there?

6    A.  Correct.

7    Q.  And -- and then, you know, it's an arrest report, right?

8    A.  Correct.

9    Q.  And so you have to -- if you make an arrest, you have to

10   explain the reasons why you arrested a person.

11   A.  Correct.

12   Q.  And it would -- and so it would include information

13   about any criminal offense that you believe you observed.

14   A.  Correct.

15   Q.  Did you have a chance to review your report before you

16   testified?

17   A.  I did.

18   Q.  And your report didn't mention anything about anyone

19   shoving each other, did it?

20   A.  I don't recall, sir.

21   Q.  Do you have the report with you?

22   A.  Not with me, no.

23              MR. KUSHNER:  Do you have a paper copy of the

24   report?  Thank you.  Thank you.

25

```
 1    BY MR. KUSHNER:

 2    Q.  If I showed you the report, would it help refresh your

 3    recollection?

 4    A.  It will.

 5              MR. KUSHNER:  Could I approach the witness?

 6              THE COURT:  Yes, you may.

 7    BY MR. KUSHNER:

 8    Q.  And showing you a copy of a report that the prosecution

 9    has graciously provided to me, is that -- is that a copy --

10    an accurate copy of the report you prepared?

11    A.  It is, sir.

12    Q.  Okay.  And can you tell me if it refreshes your

13    recollection as to whether you put in the report that you

14    saw Mr. Elmi and anyone else shoving each other?

15    A.  It does mention the part where they were inside my

16    squad.

17    Q.  Okay.  But does it mention anything about them shoving

18    each other before you placed them under arrest?

19    A.  No, it does not.

20    Q.  Okay.  So you did not -- actually, all it says is

21    that -- it says Ahmed was agitated and verbally fighting

22    with Elmi; is that correct?

23    A.  Correct.

24    Q.  It doesn't mention anything about him making any kind of

25    physical contact with Elmi.
```

1   A.  Not in the reports, sir, no.

2   Q.  And it doesn't say anything about Elmi fighting with

3   Ahmed in any way.

4   A.  Verbally fighting in the report.  That's what I said.

5   Q.  Well, it doesn't say that Elmi was verbally fighting.

6   It says Ahmed was verbally fighting with Elmi.  It doesn't

7   say what Elmi was doing, does it?

8   A.  It does not.

9   Q.  Okay.  And it definitely doesn't say that Elmi was

10  shoving anyone or making any kind of physical contact with

11  Ahmed or anyone else.

12  A.  No, it does not.

13  Q.  That's because there actually wasn't any kind of shoving

14  that was happening.

15  A.  I wouldn't say so.  It was just not included in the

16  report.

17  Q.  So when you -- let's go back to when you arrived at the

18  scene.  So the -- so everyone associated with the vehicle

19  was in the vicinity of the area; is that right?

20  A.  Correct.  Like I said before, there was two by the

21  vehicles and there was one person around the corner from the

22  scene.

23  Q.  And one of the people by the vehicle was Mr. Elmi.

24  A.  Correct.

25  Q.  Okay.  So he didn't -- he didn't leave the scene.

FIELD - CROSS (KUEBER)

1   A.  Per the remarks in the call, actually he did, but when I

2   arrived, I mean, they were in the area, so --

3   Q.  When you arrived, he was at the scene of the accident.

4   A.  I would say so, yes.

5   Q.  So he hadn't left the scene of the accident.

6   A.  I -- you can say so, yeah, I guess.

7   Q.  Based on your observations, he was still -- when you

8   arrived, he was at the scene of the accident.

9   A.  You can say so, yes.

10  Q.  And so if he was at the scene, then he -- he wouldn't

11  be -- he wouldn't have committed an offense of leaving the

12  scene of an accident.

13  A.  You can say so, yes.

14  Q.  You know, and you said that you went to grab someone who

15  was -- who was kind of nearby in the bushes, right?

16  A.  That the person that was leaving the scene, yes.

17  Q.  Okay.  But -- but when you say "leaving the scene," it

18  sounds like he was still in the vicinity.

19  A.  Like the local way, yes.

20  Q.  And so you said he told you he was urinating and you

21  grabbed him?

22  A.  Yeah, that's what he said.  That's the reason why he was

23  walking away from me, yes.

24  Q.  So did you grab him while he was urinating?

25  A.  Nope.  I just told him to come back to me, and then we

1    walked together back to the scene.

2    Q.  Sure.  And so you're at the scene here.  Do you know

3    what Mr. Elmi's association with that vehicle was?

4    A.  Like I say, I mean, I -- it's for us to assume that they

5    were all in the vehicle because they were all together and

6    they seemed to know each other at the time.

7    Q.  So how do you know they were all in the vehicle?

8    A.  Did I know?

9    Q.  Yeah.

10   A.  Oh, I mean, like I said, the remarks say one thing and I

11   found people by the vehicle.  I mean, it's hard to say,

12   so --

13   Q.  All right.

14   A.  At the moment I assumed they were, yeah.

15   Q.  So they hadn't told you, but it was your assumption,

16   right, that they were in the vehicle together?

17   A.  Yeah, it's fair to say that.  I mean, usually when

18   somebody crashes, they stay by the area, so yeah.

19   Q.  Did someone identify themselves as the owner of the

20   vehicle?

21   A.  Yeah.  The person I took back to my squad, he later say

22   that it was his vehicle.  And the person that I brought back

23   to the scene mentioned that the vehicle belonged to the

24   person without the shirt, which was that person, yes.

25   Q.  And that was Ahmed?

1    A.  Correct.  Yes.

2    Q.  And do you know where Mr. Elmi, if mister -- well, you

3    said you -- you didn't know that Mr. Elmi was in that

4    vehicle, but because he was with the people it was your

5    assumption that he had been in the vehicle too.

6    A.  You know, throughout the whole incident, they all start

7    saying that they were in the vehicle.  The driver say that

8    they were all in the vehicle.  Then the person I brought

9    back to the scene said they were in the vehicle.  So, you

10   know, throughout the interaction they say that, yes.

11   Q.  And who did you identify as the driver?

12   A.  It was really confusing.  So I, like I said, you know,

13   based on my experience, I would think that the owner would

14   be driving.  Well, he say that, you know, somebody else was

15   driving.  I mean, he mention it, so --

16   Q.  So you don't know who the driver was?

17   A.  A hundred percent, no, I did not.

18   Q.  All right.  You kind of -- you guessed that the owner

19   was the driver, but you don't actually know for a fact.

20   A.  No, I didn't guess he was the driver.  Like I say, it

21   was an accident.  So I was more concerned about, you know,

22   getting information for the report.  I have the owner of the

23   crashed vehicle too on scene, so --

24   Q.  Sure.  I understand.  And so I'm just trying to clarify

25   what information you had.  That's all.

1    A.  Right.

2    Q.  And so it sounds like you didn't -- you didn't have

3    information about who was actually driving the vehicle.

4    A.  Like I say, a hundred percent, no.

5    Q.  Okay.  Did you identify Ahmed -- were you able to

6    confirm that Ahmed was the owner of the vehicle?

7    A.  After I grabbed the information, yes.

8    Q.  After you grabbed the information from the car?

9    A.  Yeah.  Well, I run the plate, and then I run his

10   information, yes.

11   Q.  Okay.  Was that before or after you arrested them?

12   A.  That I got the information?

13   Q.  Yes.

14   A.  Probably after.  I went back to my computer, so it was

15   probably after, yes.

16   Q.  So you would normally run the -- you would have run the

17   computer to confirm who the driver was after you -- after

18   you did --

19   A.  Not the driver.  The owner of the vehicle, yes.

20   Q.  Thank you for clarifying.  And so -- and so as for

21   Mr. Elmi, you kind of assume that he was in the vehicle,

22   right, but you didn't know for certain?

23   A.  I -- I knew after I talked to Ahmed, because we went

24   back to the squad and we spend fair amount of time talking.

25   Like I say, he was in distress, he was crying, so he was

1    really hard to understand, it took a while, but then he

2    said, yeah, we were all in the vehicle, we were kind of, you

3    know, like, tussling and that's why we crash.

4    Q.  Okay.  And you didn't know where Mr. Elmi was positioned

5    in the vehicle when he was in there.

6    A.  I mean, I did not, but Ahmed mentioned that they were

7    close by.  So I'm guessing they were like next to each

8    other, so probably front, so -- but, like I say, a hundred

9    percent, no, I don't know where he was.

10   Q.  You don't know if he was driving or in the front?

11   A.  Correct.  No.  No idea.

12              THE COURT:  So I'm going to stop you both because

13   you are having -- you are talking over each other.

14              And for the benefit of the court reporter, Officer

15   Martinez, if you can let Mr. Kushner finish his question and

16   then answer.

17              And, Mr. Kushner, if you can let Officer Martinez

18   finish his response.

19              THE WITNESS:  All right.

20              THE COURT:  So that we have a clean record.  I

21   know it's a difficult, but thank you both.

22   BY MR. KUSHNER:

23   Q.  So you believe that Mr. Elmi was in the vehicle.

24   A.  Yes.

25   Q.  But you don't know if he was in the front or the back.

1    A.  No, I don't.

2    Q.  And you don't know if he was a driver or a passenger.

3    A.  No, I do not.

4    Q.  And so -- so it was your testimony that you asked Ahmed

5    to get his identification information from the vehicle?

6    A.  What do you mean by "testimony"?

7    Q.  Well, when you answered Mr. Wesley's questions, did

8    you --

9    A.  Oh.  Oh, yes.  Like I said, he was in distress.  So I

10   offer, hey, you know, like you don't have your ID with you,

11   can I go get it for you.  Like I said, I didn't want them to

12   get more contact than needed.  I grabbed the insurance

13   information as well.

14   Q.  Did he give you any explicit permission to go into the

15   vehicle?

16   A.  Ahmed did, yes.

17   Q.  And what was the nature of -- what did he say exactly?

18   A.  I don't recall exactly.  Like I say, I offer.  He said,

19   yes, you can get my ID from my vehicle.

20   Q.  Did he -- did he sign any kind of consent?  Did you have

21   him sign any kind of consent form --

22   A.  I did not.

23   Q.  -- to look in his vehicle?

24   A.  I did not.

25   Q.  And, again, your police report did refer to this, you

1    know, conversation that you had during the sequence of

2    events where you went and looked in the vehicle; is that

3    right?

4    A.   Correct.

5    Q.   Okay.  And in your police report you don't mention that

6    Ahmed gave you permission to go into his -- into the

7    vehicle.

8    A.   I will have to check that report, Your Honor.  I don't

9    recall word by words, so --

10   Q.   Do you want to check the report and tell me if it says

11   anything specific -- mentions anything specific that Ahmed

12   gave you permission to go into the vehicle?

13   A.   It does not specify that I asked for the permission, but

14   it mentions that I told him that I will get it for him.

15   Q.   So the report says that -- you put in your report

16   shortly after the incident that you -- that you told them to

17   stay seated in the squad while you went back to the vehicle

18   to look for his ID; is that right?

19   A.   Correct.

20   Q.   And so it doesn't say anything about asking him

21   permission to go into the vehicle.

22   A.   Not specifically, no.

23   Q.   And that's because -- you know, what it indicates is

24   that you had him sit there and went ahead and looked into

25   the -- looked in the vehicle on your own.

```
 1    A.  No.  For him.

 2    Q.  Okay.  Well, it doesn't say anything in the police

 3    report that you did it for him.

 4    A.  Correct.

 5    Q.  All right.  It just says that you went -- you went to

 6    the vehicle to look for his ID.

 7    A.  Correct.

 8    Q.  And that nothing in there giving any indication that you

 9    asked for permission or got permission.

10    A.  It's not written in the report, no.

11    Q.  And so -- so was the door open or closed when you went

12    to the vehicle?

13    A.  Which one?

14    Q.  The -- the vehicle where -- that you went into that

15    Ahmed was apparently driving.

16    A.  Right.  But which door was open?  Which one?

17    Q.  Were either of the doors open?

18    A.  The passenger was open.  The front passenger was open.

19    The driver and everything else was closed.

20    Q.  Okay.  And so when you went to look in the vehicle, did

21    you open the driver's door?

22    A.  Correct.

23    Q.  Okay.  And then you said you shined your flashlight?

24    A.  Correct.

25    Q.  In the passenger area?
```

1    A.  In the front, front of the vehicle area, yes.

2    Q.  All right.  And that was after you opened the door.

3    A.  Correct.

4    Q.  And it's your -- your testimony that you saw a handgun

5    in the center console area.

6    A.  Correct.

7    Q.  The photograph, Exhibit 16, do you know -- did you take

8    that photograph?

9    A.  I will have to look at it.  I mean, all the pictures

10   were taken by me, yes.

11   Q.  Okay.  And were the pictures taken at the time or

12   after -- after everyone had been arrested?

13   A.  After it was -- everybody was handcuffed, yes.

14   Q.  And so --

15          MR. KUSHNER:  Do you happen to have a hard copy of

16   Exhibit 16?

17          MR. WESLEY:  I don't have a hard copy, but I can

18   pull it up on my computer quick, if you want.

19          MR. KUSHNER:  I mean, I have it too, but I can

20   show it to -- I can pull it up too.

21          May I approach the witness?

22          THE COURT:  You may.

23   BY MR. KUSHNER:

24   Q.  Okay.  I'm showing you what's been admitted as

25   Exhibit 16.  Let me reduce it so you can see the whole

```
 1    thing.

 2              THE COURT:  Are you able to link your computer to

 3    the system, so we can all see what the witness is looking

 4    at?

 5              MR. KUSHNER:  Probably.  It might take a second,

 6    but I can -- should be able to.

 7              MR. WESLEY:  If mister -- Mr. Kushner, do you have

 8    the same -- do you have the same computer I do?

 9                    (Attorneys confer.)

10              THE COURT:  All right.  Mr. Wesley, you have a

11    copy of Exhibit 16, correct?

12              MR. WESLEY:  I do, Your Honor.  This is a copy of

13    the photo of the center console.  I can pull it up on my

14    computer, if Your Honor needs to see it.

15              THE COURT:  I think it's on the flash drives that

16    was provided, right?

17              MR. WESLEY:  It's definitely on the flash drives.

18              THE COURT:  All right.  I've inserted the flash

19    drive that has been provided by the government so that I can

20    also see Exhibit No. 16, which I understand the government

21    has a copy of, of course, because it's their exhibit.

22              And then, Mr. Kushner, you are proposing to take

23    your laptop over to the witness and show that to him?

24              MR. KUSHNER:  Yes.

25              THE COURT:  Okay.  Does the government have any
```

```
1    objection to that?

2                 MR. WESLEY:  No, Your Honor.

3                 THE COURT:  All right.  Perhaps one of you, or if

4    not both, want to be masked, if you are getting that close

5    to talk.

6                 THE WITNESS:  I will --

7                 MR. KUSHNER:  I've been vaccinated, but --

8                 THE COURT:  I'm not seeing the exhibit on this.

9                 MR. KUSHNER:  It's No. 16.

10                THE COURT:  Right.  No.  It's --

11                Mr. Wesley, I'm looking at it, and it looks like

12   there is a McAfee removal file.  Perhaps I'm in the wrong --

13                MR. WESLEY:  This is the process that your clerks

14   have to go through, Your Honor.  There's some sort of --

15                THE COURT:  An executable?

16                MR. WESLEY:  Yeah.  And I forget what the file

17   name is, but you got to open a folder and then type in that

18   password that's on the Post-it.

19                THE COURT:  I'm not able to open it up with the

20   password that you've given me, which is this (indicating),

21   so --

22                MR. KUSHNER:  Does anyone have the converter, so I

23   can hook --

24                THE COURT:  No, I think -- here's what we're going

25   to do.  We'll go ahead with the testimony.
```

```
 1              And in fact I think, Mr. Wesley, that I may have

 2      locked the entire drive now because I entered the password

 3      three times.

 4              MR. WESLEY:  I can get you a --

 5              THE COURT:  Okay.

 6              MR. KUSHNER:  Did you remember the exclamation

 7      point at the end?

 8              THE COURT:  I did.  Yes, I did.

 9              MR. KUSHNER:  It held me up the first two times.

10              THE COURT:  Yeah.  No, I didn't think it was there

11      just because of excitement about the exhibits, so --

12              All right.  So here's what we'll do.  Mr. Kushner,

13      why don't you go ahead and examine the witness with Exhibit

14      No. 16, and you'll just have to keep in mind that I don't

15      see what's being shown.

16              MR. KUSHNER:  I can probably just go off the --

17              THE COURT:  Sure.

18              MR. KUSHNER:  I'm not going to ask him much

19      questions, but just foundational.  This is Exhibit 16.

20              THE COURT:  All right.  Thank you.

21      BY MR. KUSHNER:

22      Q.  And so I'm showing you what's been marked as Exhibit 16.

23      Do you recognize that photograph?

24      A.  Yeah.  Yes, sir.

25      Q.  This is a photograph you identified to Mr. Wesley that
```

```
 1    you took, and it's supposed to show where the gun was found.

 2    A.  Correct.

 3    Q.  And so you took that photograph.

 4    A.  Correct.

 5    Q.  And you took it after the arrest; is that right?

 6    A.  Correct.

 7    Q.  And so do you know if anyone handled the gun -- someone

 8    could have handled the gun between when you made the arrest,

 9    when you first found it and when you took the photograph?

10    A.  You mean another officer or --

11    Q.  Yes.

12    A.  No, nobody went inside the vehicle.

13    Q.  Now, you could have handled the gun during that time.

14    A.  No, I didn't.  Before everybody was handcuffed and

15    everything, I -- I, like I said, I saw the handgun, and then

16    after that we dealt with the people outside first, and then

17    I went back and dealt with the evidence, yeah.

18    Q.  And how long after the -- how long after you placed them

19    under arrest did you take the photographs?

20    A.  I do not recall.  I don't know.

21    Q.  Was it hours?

22             THE COURT:  Okay.  Go ahead and answer the

23    question.

24             THE WITNESS:  Probably not hours, no.

25             THE COURT:  And then, Mr. Kushner, I'm going to
```

```
 1    ask you to back up, if you're done with the exhibit, and

 2    return to the podium.

 3              MR. KUSHNER:  I'm going to go over one other

 4    photograph.

 5              THE COURT:  Okay.

 6    BY MR. KUSHNER:

 7    Q.  So you are not -- it was probably less than an hour, but

 8    could have been around an hour.

 9    A.  Hard to say.  Like I said, I don't recall how long it

10    took.

11    Q.  In any event, it was after -- was it after mister --

12    after the three people have already been taken into custody

13    and removed from the scene?

14    A.  What do you mean "removed from the scene"?

15    Q.  Taken to jail.

16    A.  No.  Everybody was on site.

17    Q.  And so you don't know how long after, though?

18    A.  No.

19    Q.  Okay.  And I'm going to just show you another photo.

20              And then the prosecution's indicated they will

21    stipulate to this.  This is the photograph right before.  So

22    I'll have to produce another copy and give it to the court

23    afterwards.

24              MR. WESLEY:  Your Honor, just to make the record

25    clear, there were a series of photographs taken by this
```

1    officer; and whichever ones Mr. Kushner wants to introduce

2    of that series, I'll stipulate to.

3              THE COURT:  Okay.  Thank you, Mr. Wesley.

4              Then you may go ahead, Mr. Kushner.

5              MR. KUSHNER:  Just -- this is identified as the

6    prosecution's --

7              COURT REPORTER:  Would you please start over and

8    say that again?

9              MR. KUSHNER:  Sure.  The file name is

10   photo_2020-09-15_033256_4435.  Did you get that?

11             COURT REPORTER:  Yes.

12   BY MR. KUSHNER:

13   Q.  Okay.  So do you recognize this photograph?

14   A.  Yes, sir.

15   Q.  Okay.  And is this also a photograph you took?

16   A.  Yes, sir.

17   Q.  Okay.  And do you know if you -- is this photograph also

18   supposed to show where the gun was found in the car?

19   A.  Yes, sir.

20   Q.  And do you know if you took this photograph before or

21   after you took the photograph that's Exhibit 16?

22   A.  Most likely was right after --

23   Q.  Okay.  And --

24   A.  -- or before.  I don't know which one was first.

25   Q.  But for like -- was it in sequence or first one and then

1    the other?

2    A.  Correct.

3    Q.  And so this is like -- this shows like a larger -- is

4    this like a larger or smaller view of where the gun was

5    found?

6    A.  Not to be exact, but I believe to be the passenger side

7    view.

8    Q.  So it was from another angle?

9    A.  Correct.

10   Q.  So the first photo was taken from what angle,

11   Exhibit 16?

12   A.  In the first one you showed me?

13   Q.  Yes.

14   A.  Probably from the front, if you will.

15   Q.  "From the front" meaning the front of the car?

16   A.  "From the front" meaning inside the vehicle there's the

17   middle, and then I'm facing where the handle was at.

18   Q.  So you're kind of facing directly -- you're looking

19   directly at it then?

20   A.  Correct.

21   Q.  And the other one you took while you were positioned at

22   the passenger side.

23   A.  Like I say, I don't recall exactly, but I believe so,

24   yes.

25   Q.  And you don't know what a person in the backseat would

```
 1    have seen.
 2    A.  Can you repeat that?
 3    Q.  You don't know what a person in the backseat would have
 4    seen.
 5    A.  I don't know what you mean by that.
 6    Q.  If someone was sitting in the back -- did you take any
 7    pictures of the gun from the backseat?
 8    A.  No.
 9    Q.  Do you know if it would have been visible from the
10    backseat?
11    A.  I assume so, yes.
12    Q.  But you don't know that.
13    A.  If it was me, yes.  For another person, I don't know.
14    Q.  How about from the backseat on the driver's side?  Did
15    you check to see if it was visible from the backseat on
16    the --
17    A.  I did not.
18    Q.  Did you check to see if it was visible from the backseat
19    on the passenger side?
20    A.  I did not.
21    Q.  And you informed the people at the scene that you found
22    the gun shortly after you found it, right?
23    A.  Yes, right away.
24    Q.  And they informed you right away that -- someone
25    informed you right away that it was a BB gun.
```

```
1    A.  Right away?  No.  I thought it was a real gun at the

2    time when I first saw it.

3    Q.  Did someone state on the -- on the video that it was a

4    BB gun?

5    A.  Just the defendant did, yes.

6    Q.  And it was correct it was a BB gun?

7    A.  At the end, yes.

8    Q.  And do you know what, if any, statute is violated by

9    having a BB gun in the vehicle?

10   A.  By memory, no, I don't.

11   Q.  Do you know what statute is violated by having a handgun

12   in the vehicle?

13   A.  No, but I -- no.

14   Q.  And it's your testimony you didn't try to secure the gun

15   right away as soon as you found it?

16   A.  No.  I tried to secure the people first, yes.

17   Q.  You left the -- you left the gun there, at least what

18   you thought was a gun.

19   A.  Correct.

20   Q.  Now, you pat searched Mr. Elmi before you found the gun,

21   right?

22   A.  No.  No.  I did the person that I brought back to the

23   scene.

24   Q.  Okay.  According to your police report, which you still

25   have, it says that you told -- doesn't it say that you told
```

1    Elmi and Ahmed to stay and talk to your partner and then you

2    went to the corner to get Adan and -- okay.  Wait.  Hold on.

3    Did you ask Mr. Elmi what, if any, association he had with

4    the gun before you placed him under arrest?

5    A.  I did not.

6    Q.  Did you ask him if he was aware that there was a gun?

7    A.  I did not.

8    Q.  And did you ask him -- and did you confirm that he was

9    even in the car before you placed him under arrest?

10   A.  No, but I -- by directly asking him, no.

11   Q.  And you didn't ask him where he was seated in the car.

12   A.  I did not.

13   Q.  And you didn't ask anyone else where Mr. Elmi was seated

14   in the car.

15   A.  No.

16   Q.  Are you -- are you familiar with -- do you have any

17   training in assessing people under the influence of drugs or

18   chemicals?

19   A.  I have, yes.

20   Q.  And did you have any -- did you have any assessment

21   about if any of the people you encountered at the scene

22   seemed to be under the influence?

23   A.  A formal assessment like if I was performing a DUI, no;

24   but I could tell that they were, I mean, they were not

25   acting like a normal person would do.

```
1    Q.  None of them were acting normal?

2    A.  Like I say, I mean, based on my experience, I saw some

3    indicators that they probably were maybe, you know,

4    intoxicated by substances or alcohol, but at the moment I

5    didn't do like a full, long DUI.

6    Q.  But it was your impression that all of them seemed to be

7    under the influence of some kind of substance or chemicals?

8    A.  I wouldn't say all of them.  I will say for sure at

9    least Ahmed, because that was the one that I dealt the most

10   in the beginning.  I will say that for the other two my

11   interaction with them was, I mean, pretty much after I

12   handcuff them and, you know, so --

13              MR. KUSHNER:  All right.  I have no further

14   questions.

15              THE COURT:  All right.  Thank you, Mr. Kushner.

16              Mr. Wesley.

17                      REDIRECT EXAMINATION

18   BY MR. WESLEY:

19   Q.  I'll be fairly brief, Officer Martinez, because I don't

20   want to confuse you as to what -- the sequence of events,

21   and it's captured on your body-worn camera.  But as you

22   recall it as you sit here on the stand today, were you able

23   to obtain information from the three individuals about who

24   the driver was of the vehicle at the time of the crash?

25   A.  No, most of the information came from the person I dealt
```

1    with, which was Ahmed, and then he state he -- he kind of

2    imply and say -- like I say, it was hard to understand what

3    he was saying because he was crying and everything, but

4    he -- he say that possibly the defendant was the one

5    driving.

6    Q.  And then so he -- Mr. Ahmed is the owner, but he's

7    saying that Mr. Elmi was the driver?

8    A.  Correct.

9    Q.  But, of course, that doesn't tell you who the driver

10   actually was, right?

11   A.  No.  Everybody was so tied to vehicles, so no idea.

12   Q.  But when you initially saw the gun, which you believed

13   to be a real gun, firearm, and you put handcuffs on

14   everybody, Mr. Elmi, the defendant, told you it was a BB

15   gun; is that right?

16   A.  Correct, he did.

17   Q.  And did that imply anything to you, him telling you that

18   what you found in the car was a BB gun?

19   A.  At the moment it didn't make any difference to me.  I

20   was more concerned about my partner's officer safety.  So at

21   that moment I didn't have the luxury to actually confirm it

22   until after the fact.

23   Q.  So even though you had a person telling you that what

24   you saw was a BB gun, what did you believe that item to be

25   from what you physically saw of it in the car?

```
1    A.  A real firearm.

2    Q.  Now, Mr. Kushner asked you if you are aware of what the

3    specific violation was for carrying a BB gun in a vehicle;

4    is that right?

5    A.  Correct.

6    Q.  And did I ask you that same question yesterday?

7    A.  Correct.

8    Q.  Did you go on your phone and find the statute and show

9    it to me?

10   A.  Correct.

11   Q.  Would it refresh your recollection if I were to show you

12   the statute, at least for what you believed the violation

13   was that all three of them got booked on that day?

14   A.  It will, yes.

15            MR. WESLEY:  Your Honor, may I approach the

16   witness to show an exhibit?

17            THE COURT:  You may.

18   BY MR. WESLEY:

19   Q.  Officer Martinez, are you able to see my screen?

20   A.  All right.  Yes.

21   Q.  And is this the statute that you showed me yesterday

22   that you believed was the violation?

23   A.  Correct.

24            MR. KUSHNER:  Is that 7181?

25            MR. WESLEY:  Yes.  And for the record it's -- and
```

1    I've shown Mr. Kushner, but it's Minnesota Statute 624.7181.

2    BY MR. WESLEY:

3    Q.  And to be clear, that's what you believed the violation

4    to be, is that right, Officer Martinez?

5    A.  Correct.

6    Q.  And then I just want to clear up one more thing about

7    this shoving in the street.  Now, you've read your report,

8    right, in preparation for testimony?

9    A.  Correct.

10   Q.  And you went and watched your body-worn camera in

11   preparation for testimony; is that right?

12   A.  Correct.

13   Q.  Do you recall seeing that shoving anywhere in the report

14   or on the body-worn camera?

15   A.  On the video.

16   Q.  So you recall seeing it in the video?

17   A.  Correct.

18   Q.  And as you sit here today from your own memory, do you

19   recall Mr. Elmi shoving Mr. Ahmed?

20   A.  Correct.  Yes.

21   Q.  Did you review any other body-worn cameras besides your

22   own in preparation for testimony?

23   A.  I did not.

24   Q.  So you believe that this would be seen on your body-worn

25   camera if -- if it was on there?

```
 1    A.  It will be on that and most likely also in the squad

 2    camera, so --

 3    Q.  And, in any event, your body camera captures what the

 4    body camera sees; is that right?

 5    A.  Correct.

 6              MR. KUSHNER:  Objection.  Confusing.

 7              THE COURT:  Overruled.

 8    BY MR. WESLEY:

 9    Q.  And despite this issue of whether the gun was real or

10    not and when you realized it was a BB gun as opposed to a

11    real gun, ultimately what were all three persons booked for?

12    A.  That there be a gun in the vehicle, that was located in

13    the vehicle.

14    Q.  Do you believe that you had any other grounds to arrest

15    these individuals based on what you saw and observed on that

16    day?

17    A.  Well, obviously the defendant was -- had the narcotics,

18    so that was another one.  At the moment I actually did not,

19    just that.

20    Q.  So that's what you were personally focused on, the BB

21    gun?

22    A.  I was, yes.

23    Q.  Thank you, Officer Martinez.  I don't have any further

24    questions for you.

25              MR. KUSHNER:  A couple of follow up here.
```

1     THE COURT:  Okay.  Mr. Kushner is going to have a

2  short recross, based on the redirect.

3                    RECROSS-EXAMINATION

4  BY MR. KUSHNER:

5  Q.  So, Officer Martinez, did your report make any -- any

6  notation that Ahmed claimed that Mr. Elmi was the driver of

7  the vehicle?

8  A.  No, sir.

9  Q.  That's something you pointed out for the first time here

10  in court today.

11  A.  Like we were discussing previously, it was on the video.

12  Q.  You think it's on the video where he identifies Mr. Elmi

13  as the driver?

14  A.  On my body-worn camera, yes.

15  Q.  You didn't note it -- you didn't note it in your report

16  at the time.

17  A.  No, sir.  I didn't think it was necessary.

18  Q.  And in your police report did you cite the statute that

19  you believe was violated.

20  A.  Not a specific statute, no.  The offense or the PC,

21  yeah.

22  Q.  So you -- you had what is called a probable cause

23  statement.  Is that in part of the document that you have?

24  A.  Correct.

25  Q.  And then you mention BB gun in the vehicle, right?

1    A.  Correct.

2    Q.  And you don't mention what statute or ordinance it

3    violated, if any.

4    A.  No, sir.  That will be in the arrest form that we do on

5    the computer.

6    Q.  And do you have any form that cited the statutes?

7    A.  The electronic form is the one that will have that.

8    Q.  I'm sorry?

9    A.  When we book them, the paperwork we do to bring people

10   to jail, that's where all that information will be.  I

11   personally don't do that in my personal reports.

12           MR. KUSHNER:  Okay.  I have no further questions.

13           THE COURT:  Okay.  Officer Martinez, you may step

14   down.  Thank you.

15           THE WITNESS:  Thank you, Your Honor.

16           THE COURT:  And for the counsel, in terms of a

17   recess, we had taken a very short recess, but I had intended

18   to let people eat something, if they needed to.  Mr. Wesley.

19           MR. WESLEY:  Your Honor, I suspect that the next

20   witness will take as long as -- just as long as one of the

21   other two.  So I agree we should take a recess.  I will -- I

22   think he's available all afternoon, and I'll try to make

23   sure that he comes back whenever the court wants to come

24   back.

25           THE COURT:  Okay.  Thank you.

```
 1               And, Mr. Kushner, I assume you would want a short
 2     recess as well for lunch or something.
 3               MR. KUSHNER:  I don't need it.
 4               THE COURT:  Okay.
 5               MR. KUSHNER:  I don't object either.
 6               THE COURT:  Okay.  We're going to take a short
 7     recess then just to give everyone a break as well.  We will
 8     reconvene at 2:10.
 9               And, Mr. Wesley, if you want to check with your
10     witnesses.
11               MR. WESLEY:  I can do that right now, Your Honor.
12               THE COURT:  All right.  We'll stay here until we
13     make sure that they can come back.
14                         (Short recess.)
15               MR. WESLEY:  Sorry, Your Honor.  I'm being told
16     that there is some shooting incidents in North Minneapolis
17     and in or near St. Paul.  And he's here.  I'm asking him to
18     confirm with his supervisors that he doesn't have to go
19     anywhere to track down any shooting suspects.  He says he's
20     checking right now.
21               THE COURT:  Okay.
22               MR. KUSHNER:  I guess there's always something
23     happening nowadays.
24               THE COURT:  We'll take a short recess until
25     Mr. Wesley comes back in, and then I will come back out and
```

1    say if we're going to take a longer one or not.

2             We're in recess.

3             THE CLERK:  All rise.

4                      (Short recess.)

5             THE COURT:  Please be seated.

6             All right.  Mr. Wesley, we took a short recess

7    just so we didn't all have to sit here, but I'm ready to

8    hear from you.  What's the situation with your witness?

9             MR. WESLEY:  So the situation is apparently a lot

10   of people have been called in.  He is in communication with

11   his immediate sergeant right now asking to remain here.

12            THE COURT:  Okay.

13            MR. WESLEY:  I told him, you know, if you

14   literally have to run because like the guy's outside or

15   something, I could request that you testify -- because we're

16   getting a second hearing anyways for Oklahoma, so I could

17   request that he testify at that hearing, but I think he's

18   still --

19            Oh.  He's good to stay?  Okay.

20            He's good to stay.

21            THE COURT:  Okay.  Well, then, like I said, I had

22   planned on taking a recess, and I think that is in order at

23   this point to give everyone a break.  So I'm still going to

24   say 2:20, even though that has shortened our time frame.  So

25   we will recess until 2:20.

1              And, Mr. Wesley, if you can address the exhibits

2       with my clerk as well, that would be appreciated.

3              MR. WESLEY:  I will do that.

4              THE COURT:  All right.  We're in recess.  Thank

5       you.

6              (Recess taken at 1:54 p.m. until 2:27 p.m.)

7              THE COURT:  All right.  Please be seated.

8              We are back on the record in the matter of United

9       States versus Elmi, Case No. 20-cr-262.

10             Mr. Wesley, is the government ready with its next

11      witness?

12             MR. WESLEY:  Yes, Your Honor.  And we'd call

13      Officer Nathan Sundberg.

14             THE COURT:  Okay.  Thank you.

15             Okay.  Officer Sundberg, if you want to come up to

16      the witness stand, and then I will swear you in.

17                          NATHAN SUNDBERG,

18      called on behalf of the government, was duly sworn, was

19      examined and testified as follows:

20             THE WITNESS:  I do.

21             THE COURT:  Okay.  Thank you.  And if you'd like

22      to sit down, I'll let Mr. Wesley get your name on the

23      record.  And witnesses are permitted to remove their masks,

24      if they prefer, when testifying.

25             THE WITNESS:  My full name is Nathan, N-A-T-H-A-N,

```
 1    John, J-O-H-N, Sundberg, S-U-N-D-B-E-R-G.

 2                       DIRECT EXAMINATION

 3    BY MR. WESLEY:

 4    Q.  Thank you, Officer Sundberg.  Could you please tell the

 5    court how long you've worked for the Minneapolis Police

 6    Department?

 7    A.  I've been with the Minneapolis Police Department for

 8    seven years.

 9    Q.  And did you have prior law enforcement experience

10    before?

11    A.  I do.  I worked for Hennepin County for over eight

12    years.

13    Q.  And that was as a deputy?

14    A.  Correct.

15    Q.  In your role with the Minneapolis Police Department,

16    have you worked in any particular specialized units?

17    A.  Yes.  I'm currently assigned to the gun investigations

18    unit.

19    Q.  Prior to that, what unit did you work in?

20    A.  The gang -- what was it called?  Well, the gang unit.

21    Q.  And is it fair to say that the gang unit was effectively

22    consumed by the weapons unit?

23    A.  Yes, sir.

24    Q.  When you were working with the gang unit, did that

25    include the time period back in June of 2019?
```

```
 1    A.  Yes, sir.

 2    Q.  And from your work with the gang unit, did you become

 3    familiar with two Somalia gangs in particular, the Somalia

 4    Outlaws and the 1627 Boys?

 5    A.  Yes.

 6    Q.  Could you describe for the court anything that was

 7    unique with those two particular gangs that caused law

 8    enforcement concern with regard to their criminal activity

 9    and behavior?

10    A.  One thing in particular was a lot of fentanyl activity.

11    Q.  And back during that time period, I mean, then and now,

12    are there still a lot of overdose deaths resulting from the

13    use of fentanyl?

14    A.  Yes.

15    Q.  Any other concerns that you can think of regarding

16    particularly the Somalia gangs?

17    A.  Well, not different from other gangs, but the use of

18    firearms, carrying firearms involved in shootings.

19    Q.  Are you familiar with a person by the name of Fowzi Elmi

20    and specifically prior to the June 1st, 2019, stop?

21    A.  Yes.

22    Q.  And were you familiar with his brother Fahad Elmi?

23    A.  Yes.

24    Q.  And did you have any information that led you to believe

25    they were members or associates of the 1627 Boys?
```

```
 1    A.  Yes.

 2    Q.  On June 1st of 2019 were you working?

 3    A.  I was.

 4    Q.  And that was part of the gang unit?

 5    A.  Correct.

 6    Q.  Did you and your unit, the officers that were working,

 7    receive information from Officer Christopher Dauble?

 8    A.  Yes, we did.

 9    Q.  Do you recall the general nature of what that

10    information was and where it came from?

11    A.  Officer Dauble had informed us early in our shift that

12    he was aware that there was a vehicle that was in the area

13    of the Second Precinct somewhere.  He gave us some specifics

14    about the vehicle.  It was a 2018 Toyota RAV4, I believe

15    dark in color, and he gave a specific plate.  I believe it

16    was boy, yellow, king 063.  He said in that vehicle he had

17    information that there were -- there was at least one

18    weapon, one gun, and a large number of fentanyl pills.

19    Q.  Do you recall any -- do you recall if the information

20    was provided by a particular individual, not the name, but

21    do you know where the information came from?

22    A.  Yes.  Yep.  I was aware that Officer Dauble was in

23    contact with someone.

24    Q.  Was it a CRI?

25    A.  Yes, it was.
```

1    Q.  All right.  So you received that information early in

2    your shift.  Did you go to the particular area where the CRI

3    had described the vehicle would be?

4    A.  Yes, we did.

5    Q.  And who was the one who actually located the vehicle?

6    A.  I was.

7    Q.  And you found it, and you knew it by license plate and

8    make and model?

9    A.  Correct.

10   Q.  Did you begin following it around?

11   A.  We tried to make it obvious that we were trying to --

12   not to make it obvious that we were looking for that

13   vehicle.  So when we located it -- when I located it in the

14   area of 6th and Hennepin or 6th and University, my partner,

15   who was driving, made a turn to go eastbound on University,

16   just to kind of be in that area.  And then we got on our

17   radio and informed the rest of the guys that were working

18   that we had located the vehicle.

19   Q.  And once everyone was in place and able to make the

20   stop, as safely as you can, is that what in fact happened?

21   A.  Yes.

22   Q.  Were there five occupants in the vehicle?

23   A.  Yes, there were.

24   Q.  Do you recall which occupant you dealt with at least

25   initially?

```
 1    A.  Yes, I do.

 2    Q.  Who did you deal with?

 3    A.  I dealt with Mr. Fowzi Elmi.

 4    Q.  And was he in the front passenger seat of the vehicle?

 5              MR. KUSHNER:  Objection.  Leading.

 6              THE COURT:  Sustained.

 7    BY MR. WESLEY:

 8    Q.  Which seat of the vehicle was Mr. Fowzi on then?

 9    A.  He was in the front passenger seat.

10    Q.  The nature of this particular stop, was it what's called

11    a felony stop?

12    A.  Correct.

13    Q.  Can you describe --

14              MR. KUSHNER:  Objection.  Leading.

15              MR. WESLEY:  Your Honor, these are --

16              THE COURT:  It's overruled.

17    BY MR. WESLEY:

18    Q.  Could you please describe for the court what a felony

19    stop is and why it's conducted?

20    A.  We have -- it can be conducted in slightly different

21    ways, but the gist of the stop is having numbers.  You want

22    to have a number of police officers that are there

23    approaching the vehicle with your firearms drawn, your duty

24    weapons drawn, with knowledge that you believe that there

25    are firearms in that car.
```

1    Q.  And what's the purpose in the large amount of numbers

2    and approaching with firearms, rather than just walking up

3    and knocking on the window?

4    A.  It's primarily safety.

5    Q.  In dealing with Mr. Elmi, were you the one who searched

6    him?

7    A.  Yes, I was.

8    Q.  Could you please describe for the court as

9    systematically as you can how you searched him and what you

10   found?

11   A.  I recall I patted down his outer clothing.  I recall

12   locating a large amount of cash in his right -- in a right

13   pant pocket.  As I moved down his right leg, there was a

14   large bulge that felt like pills, and I located a few

15   baggies.  I believe two bags of pills.  When I went down the

16   left-hand side, there were additional pills in his left

17   sock.

18   Q.  And this -- the method or the manner of the search that

19   you -- that you were conducting, was it what you would call

20   a full-blown probable cause arrest search or were you

21   frisking merely for weapons?

22   A.  Yes, merely for weapons.

23   Q.  And as you were doing that, when you mentioned you came

24   across a large amount of cash, could you tell what that

25   object was?

1    A.  It felt like a hard square.  And certainly there are --

2    would I bet my life on it?  No, absolutely not.  There could

3    easily be a knife in there or even a very small -- I mean,

4    there's small 6-shot .45 caliber guns that are the size of

5    an iPhone 6.

6    Q.  And so that was in the upper right front pocket?

7    A.  Correct.

8    Q.  And then moving on from there, you got to the ankles.

9    A.  Correct.

10   Q.  And as you were frisking for weapons, was it immediately

11   apparent to you that they were pills?

12   A.  Yes.

13          MR. KUSHNER:  Objection.  Leading.

14          THE COURT:  Overruled.

15   BY MR. KUSHNER:

16   Q.  So in total, from the two ankles, the right ankle and

17   the left ankle, do you remember approximately how many pills

18   you pulled off of Mr. Elmi's person at that point?

19   A.  I believe there were three bags.  I'm not sure of the

20   exact count.

21   Q.  Could you tell the court, based on finding a large

22   amount of cash -- and I should -- do you recall how much

23   cash it was in his pocket?

24   A.  It was in excess of 1500, I believe.

25   Q.  And after finding that large amount of cash and then the

CASE 0:20-cr-00262-ADM-ECW   (Doc. 87)

1    three bags of pills in his ankles, what did you end up doing

2    with Mr. Elmi at that point?

3    A.  I had him take a seat in my squad, and I removed his

4    shoes and socks.

5    Q.  Why did you remove his shoes and socks?

6    A.  To see if there were any more pills that were in his

7    socks.

8    Q.  Did you find any in his shoes and socks at that time?

9    A.  I did not.

10   Q.  Where did you put Mr. Elmi after removing his shoes and

11   socks?

12   A.  In the rear of my squad.

13   Q.  Did you put his shoes and socks in there with him?

14   A.  Yes, I did.

15   Q.  Were you made aware at some other point in time that one

16   of your fellow officers discovered something of note?

17   A.  Yes, I did.

18   Q.  And what did they discover?

19   A.  Additional bags of pills.

20   Q.  And where were those bags of pills?

21   A.  At the floor by his feet.

22   Q.  And ultimately did you grab those, and then those were

23   taken into custody?

24   A.  Yes.

25   Q.  Do you recall exactly how many additional baggies of

1    pills were found?

2    A.  I believe it was three additional.

3    Q.  And for the court's sake, when she's reviewing the

4    video -- your body-worn camera is on?

5    A.  Yes.

6    Q.  When she's reviewing the video, Mr. Elmi was in the

7    backseat of a squad car; is that right?

8    A.  Yes, he was.

9    Q.  Was there also another individual?

10   A.  Yes, there was.

11   Q.  So the baggies that were found, whose feet were they by?

12   A.  Mr. Elmi's.

13   Q.  Were you also made aware, after the individuals were

14   removed, was another item of interest found?

15   A.  Yes.  I learned shortly after that that there was a

16   firearm found in the rear, in the rear of the car.

17   Q.  And specifically do you remember which area of the rear

18   of the car?

19   A.  By the spare tire well.

20   Q.  Now, as I mentioned, your body-worn cameras are already

21   in evidence.  But for the court's benefit, you get to name

22   your body-worn cameras when you are kind of saving them and

23   putting them into the chain of custody, right?

24   A.  Yes.

25   Q.  And yours are narc, N-A-R-C, underscore, weap,

```
 1    W-E-A-P --

 2    A.  Correct.

 3    Q.  -- dash 3 and 4?  Is that right?

 4    A.  That sounds right.

 5    Q.  And there's additional ones, but for the court's benefit

 6    it's Exhibits 1 and 2.

 7              During the body-worn camera, when the court

 8    reviews it, did you express any sort of familiarity with

 9    Mr. Fowzi Elmi and Mr. Fahad Elmi?

10    A.  Yes.

11    Q.  In fact, did you use the phrase something to the effect

12    of "Funny how I know that"?  Is that right?

13    A.  Yes, sir.

14    Q.  As Mr. Elmi is being brought out of the vehicle very

15    initially, he mentions to you that there's an injury to his

16    leg; is that right?

17    A.  Correct.

18    Q.  And what was your response?

19    A.  I believe my response was -- I asked him what's wrong

20    with his leg, and I believe he indicated that he had been

21    shot.

22    Q.  Well, were you aware that he had been shot --

23    A.  Yes.  Yep, yep.

24    Q.  And that was the first --

25              COURT REPORTER:  Excuse me.  Please repeat your
```

1    question again, Mr. Wesley.

2    BY MR. WESLEY:

3    Q.  And was that prior to the June 1st stop?

4    A.  Yes.

5    Q.  And basically on the video you say, "It's funny how I

6    know that."

7    A.  Correct.

8    Q.  And there's a series of those things where you know

9    things about Mr. Elmi and his brother.  And just so the

10   court's aware, it's because you had prior --

11   A.  Familiarity.

12   Q.  (Inaudible).

13   A.  Correct.

14           COURT REPORTER:  Excuse me.  You are speaking over

15   each other.

16           MR. WESLEY:  Sorry.  My apologies.  So let me slow

17   down.

18   BY MR. WESLEY:

19   Q.  So just so the court's aware, there's a series of times

20   in the video where you expressed basically foresight or

21   advance knowledge --

22           MR. KUSHNER:  Objection.  Deleting.

23           THE COURT:  The objection is overruled.  First of

24   all, the question has already been asked without objection,

25   and it's not going to the -- it's not going to material

1    issues, as far as I can understand, unless, Mr. Kushner, you

2    want to elaborate on your concerns.

3           MR. KUSHNER:  Well, you know, I mean, the

4    prosecution has been leading the witness the whole way, and

5    I guess at some point I make objections, and so these are

6    all leading questions.  He's completely feeding testimony to

7    the witness, as he's been doing for the whole hearing, and

8    I'd ask the -- I'd request that the court instruct the

9    prosecutor to ask proper questions for direct examination

10   and not keep providing his own testimony for the witness to

11   just affirm.

12          THE COURT:  All right.  Well, as I said, this

13   objection is overruled because the question has already been

14   asked, and it's being repeated for the benefit of the court

15   report, so we have a clear question.  To the extent the

16   examination can proceed consistent with the Rules of

17   Evidence and so on, that's -- that's what I would expect

18   from any lawyer here.  I've ruled on all the objections that

19   have been made.  So if there are concerns, then they can be

20   raised in objections.

21          With all of that, Mr. Wesley, you can repeat your

22   question, please.

23          MR. WESLEY:  I wish I could remember the exact

24   phrasing of it at this point, but essentially I'll ask it

25   this way.

```
1    BY MR. WESLEY:

2    Q.  Officer Sundberg, if there are any points in the video

3    where you express future or advance knowledge of what

4    Mr. Elmi or his brother is going to say, why is it that you

5    know so much about these two?

6    A.  Because I've dealt with them before.

7    Q.  Other than locating the items you've described on

8    Mr. Elmi, did you have any other significant involvement in

9    this case that's relevant to this particular motions

10   hearing?

11   A.  Not that I can recall.

12   Q.  Thank you, Officer Sundberg.  I don't have any further

13   questions for you at this time.

14   A.  You are welcome.

15            THE COURT:  Okay.  Thank you, Mr. Wesley.

16            Mr. Kushner, your cross-examination.

17                      CROSS-EXAMINATION

18   BY MR. KUSHNER:

19   Q.  Okay.  Good afternoon, Officer Sundberg.

20   A.  Good afternoon.

21   Q.  My name is Jordan Kushner.  I don't believe we met

22   before.  I'm the lawyer for Mr. Elmi.

23            So you were -- you've testified you were involved

24   in this stop of the vehicle where Mr. Elmi was a passenger?

25   A.  Yes, I was.
```

```
1    Q.  And you stated that you were familiar with him from

2    before?

3    A.  Yes.

4    Q.  Had you spoken to him or you just knew him through

5    investigation?

6    A.  Through investigations.

7    Q.  And where was he seated when you stopped the vehicle?

8    A.  In the front passenger seat.

9    Q.  And do you know how long he had been in the vehicle

10   before you stopped it?

11   A.  I do not.

12   Q.  And who was the driver?

13   A.  Of the Toyota?

14   Q.  Yes.

15   A.  I don't recall.

16   Q.  Okay.  And there were four passengers -- four people in

17   the car, four occupants in the vehicle?

18   A.  Aside from the driver?

19   Q.  Well --

20   A.  I believe there were five total.

21   Q.  Five.  Okay.  And so how many -- so were there three in

22   the backseat?

23   A.  Correct.

24   Q.  And it's your testimony that -- okay.  So you had

25   everyone exit the vehicle; is that right?
```

```
 1    A.  Yes.

 2    Q.  And it's your testimony that you performed a weapons

 3    search on Mr. Elmi?

 4    A.  Yes.

 5    Q.  And so that would mean a pat search?

 6    A.  Correct.

 7    Q.  So you weren't trying to find out what he had on him,

 8    but the purpose of that was just to see if he had any

 9    weapons.

10    A.  Correct.

11    Q.  And at that point you didn't have probable cause to

12    arrest him, right?

13    A.  At that point, no.

14    Q.  All right.  But you believe that you had -- had

15    necessary cause to search him for weapons?

16    A.  Yes.

17    Q.  And so your testimony is that you -- you found what you

18    thought was a large amount of money?

19    A.  I found a large amount of money.  I wasn't sure exactly

20    what was in his pocket.

21    Q.  All right.  And where was that located?

22    A.  In his right pant pocket.

23    Q.  All right.  And so you felt a big bulge in his

24    right-hand pocket?

25    A.  Correct.
```

1   Q.  Okay.  And it was actually paper currency?

2   A.  Correct.

3   Q.  Okay.  And your testimony is when you felt it, you

4   didn't know what it was?

5   A.  I didn't know exactly what it was, no.

6   Q.  Did you ask him what it was?

7   A.  I don't recall.

8   Q.  Okay.  Did you take it out of his pocket --

9   A.  Yes, I did.

10  Q.  -- right away?

11  A.  Yeah.

12  Q.  Did you -- you didn't have any reason to believe it was

13  a gun?

14  A.  You can -- Defense Technologies makes a .45 caliber

15  6-shot that is the size of about two iPhone 6s put together.

16  It's very small and square.  So it's -- aside from that or a

17  knife --

18  Q.  Okay.

19  A.  -- there could have been a weapon in his pocket.

20  Q.  You've found those kinds of guns on the streets?

21  A.  Yes.

22  Q.  All right.  And then you continued to search down his

23  pants; is that right?

24  A.  Yes.

25  Q.  And which did you search first, the right ankle or the

1    left ankle?

2    A.  The right.

3    Q.  All right.  Or I'm sorry.  Okay.  Was it -- so you --

4    how did you do that then?  Did you go down his pants all the

5    way to his ankle or did you go up?  Did you go up or down?

6    A.  I went from his waist to his ankle.

7    Q.  All right.  And so front and back?

8    A.  I don't recall specifically.

9    Q.  All right.  And where did you -- where did you feel

10   something?  Where on the right side did you feel something?

11   A.  In his right sock.

12   Q.  In his sock?

13   A.  Correct.

14   Q.  All right.  And so did he have shoes on?

15   A.  He did.

16   Q.  And so was it the part of the sock inside the shoe or --

17   A.  No.  Above his shoe.

18   Q.  And how large was this -- I mean, so what brought your

19   attention to that part of the sock?

20   A.  It was a reasonably large bulge.

21   Q.  And so then what you -- you like took -- took whatever

22   it was outside the sock?

23   A.  I felt it and removed what was pills.

24   Q.  All right.  And these were -- how many pills?

25   A.  I don't know the exact count.

```
 1     Q.  Okay.  How many bags?

 2     A.  I believe in the right sock -- in one sock it was two

 3     bags and one sock it was one.  It was three total.

 4     Q.  I'm sorry.  I'm -- so in the right sock it was one bag?

 5     A.  I don't recall if the right sock had two bags or one

 6     bag.  I know one sock had two and one had one.

 7     Q.  And you don't recall how many pills there were?

 8     A.  No, I wasn't involved in counting them.

 9     Q.  And what was it?  Like more than a hundred?

10     A.  It was quite a few.

11     Q.  More than a hundred?

12     A.  Possible.

13     Q.  Now, these pills are very small, right?

14     A.  Yes.

15     Q.  And so they wouldn't take up much space.

16     A.  Enough to -- enough to be noticeable.

17     Q.  All right.  But at this point you weren't -- you were

18     only searching for weapons.

19     A.  At that time, yes.

20     Q.  And pills don't have any resemblance to weapons.

21     A.  Not until I came up to it, no.

22     Q.  And so when you felt it, it wasn't anything large enough

23     to be a gun.

24     A.  No.

25     Q.  And there wasn't -- wasn't even large enough to be a
```

```
1    knife.

2    A.  No.

3    Q.  It didn't feel like a knife.

4    A.  No.

5    Q.  But you nevertheless removed these items from his sock.

6    A.  Correct.

7    Q.  And so before you removed them, you didn't -- you didn't

8    have any idea what it was that was in his sock.

9    A.  I believed it to be pills.

10   Q.  But you didn't know if it was pills or something else.

11   A.  I wasn't one hundred percent certain, no.

12   Q.  And at that point, at the point that you were searching

13   him, there hadn't been any drugs found in the vehicle or on

14   any of the people there?

15   A.  No.  It was early in the investigation.

16   Q.  All right.  And so after you -- you searched the right

17   ankle and took some bags out of his -- one or more bags out

18   of his sock and you searched the left, the left leg; is that

19   right?

20   A.  Yes.

21   Q.  And then you also found bags in his sock again?

22   A.  Yes.

23   Q.  And you don't recall how many?

24   A.  Again, it was three bags total.  I don't recall which

25   sock had two and which sock had one.  I'd have to refer to
```

```
 1    my --

 2    Q.  But same situation.  It wasn't anything that -- whatever

 3    you felt wasn't anything that resembled a weapon.

 4    A.  No.

 5    Q.  And you --

 6    A.  No.

 7    Q.  And you suspected they were pills, but you didn't know

 8    if they were pills.

 9    A.  Correct.

10    Q.  Right?  I take it, the reason you suspected they might

11    be pills is because you had heard this information about

12    some informant saying that they were selling -- that they

13    were bringing drugs.

14    A.  Correct.  And once I found the pills in the right sock,

15    I had reason to believe that they were pills in the left.

16    Q.  Now, you testified that there were some bags of pills

17    found on the floor; is that right?

18    A.  Yes.

19    Q.  And -- but you didn't find them.

20    A.  I did not locate them, no.

21    Q.  Do you know who found them?

22    A.  It was one of my partners.  I don't know specifically

23    who found them.

24    Q.  One of the partners told you he found them.

25    A.  Yes.
```

```
 1    Q.  And that was underneath the front seat?

 2    A.  It was at the feet of Mr. Elmi.

 3    Q.  Well, Mr. -- Mr. Elmi's feet weren't there when the

 4    pills were found, right?

 5    A.  I don't recall if he had just been removed from the car.

 6    They were transferring him from one squad to another.

 7    Q.  So your understanding is that there was pills found at

 8    his feet after he left the squad -- after he --

 9    A.  After he was placed in the squad.

10    Q.  After he was placed in the squad car.

11    A.  Yes.

12    Q.  So after you had already placed him under arrest.

13    A.  Yes.

14              MR. KUSHNER:  All right.  I have no further

15    questions.

16              THE COURT:  Okay.  Thank you, Mr. Kushner.

17              Mr. Wesley.

18                    REDIRECT EXAMINATION

19    BY MR. WESLEY:

20    Q.  When you were frisking him, but after you found the

21    money and you got to the ankle, what exactly did you feel

22    during the frisk?

23    A.  I felt what I believed to be a bag of pills.

24    Q.  And what exactly about the touch does it make you

25    believe it to be a bag of pills?
```

```
1     A.  I've just -- over the course of my career, I've felt

2     bags of pills on a number of people, and it's just -- it's

3     a -- it's a distinct feeling.

4     Q.  And in this particular case were you made aware of what

5     the tipster said was in the car?

6     A.  Yes.

7     Q.  And what specifically was in the car?

8     A.  Fentanyl pills.

9     Q.  And so the court knows, when you're talking fentanyl

10    pills, are there a bunch of different shapes and sizes or is

11    it pretty consistent from what you guys are pulling off --

12    A.  They're pretty consistent.

13    Q.  And what's that consistency?

14    A.  They're small blue pills.

15    Q.  And, you know, what shape is it?

16    A.  Round, typically.

17    Q.  And in the video you can see yourself actually

18    recovering those baggies?

19    A.  Yes.

20    Q.  With regards to the pills that were in the squad that

21    was located by another officer, did you do a full-blown

22    search incident to arrest prior to putting him into that

23    squad vehicle?

24    A.  No.

25    Q.  Do you recall a particular phrase you used on the
```

1    body-worn camera with regard to the shoes and socks that you

2    removed from Mr. Elmi?

3    A.   Yes.

4    Q.   What was that term?

5    A.   I believe after the pills were found on the floor of the

6    car, I was surprised because I told one of my partners -- I

7    said, "I jailed him."

8    Q.   And what does "jailed him" mean?

9    A.   I spent a number of my -- the beginning of my career

10   working at the Hennepin County Jail; and when an inmate

11   first comes in, a defendant first comes in, one of the

12   things they do when they pat them down is remove their shoes

13   and socks.

14   Q.   So you had removed his shoes and socks, but obviously

15   there was still pills there?

16   A.   Correct.

17   Q.   Based on your training and experience working at the

18   jail, working on the street, are there other areas of a

19   person's body that they can conceal pills?

20   A.   Absolutely.

21   Q.   And did you search all those areas of Mr. Elmi prior to

22   putting him into the vehicle?

23   A.   No, I did not.

24   Q.   All right.  Thank you, Officer Sundberg.  I don't have

25   any further questions for you at this time.

```
 1    A.  Thank you.

 2              THE COURT:  Okay.  Mr. Kushner, do you have any

 3    additional cross-examination?

 4              MR. KUSHNER:  Yes.

 5                    RECROSS-EXAMINATION

 6    BY MR. KUSHNER:

 7    Q.  So, Officer Sundberg, when you -- when you felt the

 8    object in Mr. Elmi's socks that you said you believed were

 9    pills, were you able to feel the shape of the pills?

10    A.  Not the exact shape, but I could feel, you know, the

11    texture.

12    Q.  Okay.  And is the texture of these pills any different

13    than prescription pills?

14    A.  Not necessarily.

15    Q.  Is it -- is it any different from other -- other kinds

16    of objects, I mean, other objects that someone could have

17    besides pills?

18    A.  Not by touch, no.

19    Q.  You -- you wouldn't know, though, specifically what they

20    were until you looked at them.

21    A.  Correct.

22    Q.  And did you actually take off Mr. Elmi's pants in the

23    course of the search?

24    A.  Take them off?  No.

25    Q.  Was he stripped down to his boxers at some point?
```

1   A.  He may have at the jail, but not at the scene of the

2   stop.

3           MR. KUSHNER:  I don't have anything further.

4           THE COURT:  Okay.  Thank you.

5           Officer Sundberg, you may step down.  Thank you.

6           Mr. Wesley.

7           MR. WESLEY:  Your Honor, I don't have any further

8   witnesses at this time, subject to the earlier discussions

9   about a continued hearing for Oklahoma and potentially

10  Officer Grout or unavailable officers.

11          THE COURT:  Okay.  Thank you.

12          Is there any evidence that you wanted to present

13  today, Mr. Kushner?

14          MR. KUSHNER:  No, not at this time.  I will wait

15  and see what the government presents.

16          THE COURT:  Okay.

17          MR. KUSHNER:  I did have some discussion with

18  Mr. Wesley for facilitating in the future that I'm probably

19  going to want to introduce medical records for Mr. Elmi,

20  after he got booked into Hennepin County Jail and was

21  hospitalized thereafter, and so it sounds like we have an

22  arrangement.  I'll send them to him.  Mr. Wesley will

23  probably just introduce them to the court at the next

24  hearing.

25          THE COURT:  Okay.  That's -- I'll let counsel work

```
1    that out, and we'll deal with it at the next hearing.

2              In view of the fact that we still have additional

3    testimony coming, I assume that counsel do not want me to

4    set a briefing schedule right now.  In other words, you want

5    to wait to do supplemental briefing until the second

6    hearing.  Is that --

7              MR. KUSHNER:  Yeah, I think it makes sense,

8    especially since we might -- we might still have one or more

9    witnesses on the same incidents.

10             THE COURT:  Certainly.  I agree.

11             And, Mr. Wesley, I assume that's your position as

12   well?

13             MR. WESLEY:  It is, Your Honor.

14             THE COURT:  All right.  Is there anything further

15   from the government for today then?

16             MR. WESLEY:  Not for today, Your Honor.  Thank

17   you.

18             THE COURT:  Okay.  Thank you.

19             Mr. Kushner, anything further then?

20             MR. KUSHNER:  No.

21             THE COURT:  Okay.  So we will -- my chambers will

22   work with you to get our next hearing set up, consistent

23   with the availability of the witnesses and Mr. Elmi's

24   availability.

25             We're in recess.  Thank you.
```

1          THE CLERK:  All rise.

2          (Court adjourned at 2:57 p.m., 06-11-2021.)

3                    *   *   *

4          I, Renee A. Rogge, certify that the foregoing is a

5     correct transcript from the record of proceedings in the

6     above-entitled matter.

7                    Certified by:   /s/Renee A. Rogge
                                     Renee A. Rogge, RMR-CRR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25